COMMERCIAL CREDIT CORP. *v.* GENERAL CONTRACT CORP.

No. 39598          April 11, 1955          79 So. 2d 257

*Brunini, Everett, Grantham & Quin,* Vicksburg and Jackson, for appellant.

*Wm. Harold Cox,* Jackson, for appellee.

ROBERDS, P. J.

This is a replevin proceeding involving the right to possession of a Plymouth automobile. General Contract Corporation, the appellee, (whom we will call General), claims the right of possession by virtue of a financial floor planning arrangement it had with Stewart-Lacy Motor Company, an automobile dealer at Yazoo City, Mississippi, (whom we will call Lacy). Commercial Credit Corporation, the appellant, (whom we will call Commercial) claims title to and right of possession of the automobile as an innocent purchaser for value through Lacy as the original vendor of the automobile.

The case was submitted to the jury on the issues whether or not Lacy had the right to sell the automobile in the manner he did sell it and whether Commercial had notice of the limitation upon his powers of sale under his arrangement with General. The jury returned a verdict for General, and judgment was entered accordingly, from which verdict and judgment Commercial appeals here. We think the rights of the parties turn mainly upon the right and power of Lacy, as between himself and General, to sell the automobile in the manner as hereinafter shown.

The financial floor plan arrangement between Lacy and General was under Chapter 331, Miss. Laws 1950, (Sections 5080-01 to 5080-23, both inclusive, Pocket Cumulative Supplement to Vol. 4 Miss. Code 1942 Anno.) Five written documents evidenced that relation when the automobile was purchased by Commercial from Williams Motor Company, an automobile dealer of Vicksburg, Mississippi, August 3, 1953, which dealer in turn, had purchased the car from Lacy July 13, 1953.

It is necessary to briefly set out the provisions of these five written instruments. Four of them were executed September 30, 1952.

One was called a Trust Receipt Financial Statement. It simply declared that General, called "Entruster," expected to finance Lacy, called "Trustee," under receipt transactions, in the acquisition and sale of automobiles, trucks, etc., new and used, and of all makes and models.

The second was described as "Dealer's Protection Agreement." Under it Lacy was obligated to offer to General for purchase all notes, and written evidences of indebtedness, growing out of the conduct of his business as an automobile dealer, the price of such paper to be agreed upon, with power in General to repossess, on default, any and all highway motor vehicles in the possession of Lacy. Lacy agreed to store the vehicles and he assumed all risk for damage resulting from collisions; he promised to guarantee payment for all notes and evidences of debt, and warrant the genuineness of all such documents and the signatures thereto, and to pay, upon demand, any balance owing General, waiving presentment and demand for payment, with the right in General to renew, with original makers, any evidence of indebtedness resulting from the conduct of this business, with the further right to repossess, without legal process, any and all automobiles Lacy might have on hand. An important provision of this instrument was the clause conferring upon General the right to withhold from any amount it was obligated to advance to Lacy as much as

5% of the total debt of Lacy to General, not to be less than $750.00. Repossession of automobiles and effort by General to enforce Lacy's liability would not release Lacy from further liability.

Another instrument was described as "Dealer's Wholesale Underlying Agreement." Under this Lacy and General agreed that General would pay drafts drawn for the purchase price of automobiles, trucks, etc., invoices and bills of ladings to be attached to such drafts, but the vehicles to be shipped direct and delivered to Lacy, the title thereto to vest in General under trust receipts, which Lacy agreed to execute. The document then sets out the rights of the parties, as between them, in case Lacy should go into bankruptcy, which rights are not here involved. The instrument vested in General the right to enter the premises of Lacy at any time, without legal process, and check the vehicles on the floor and in storage and those that should be, but were not, on the floor or in storage. Lacy obligated himself to keep the vehicles insured and in good repair, and agreed not to sell any vehicle involved in the arrangement except in accordance with the existing contract between the parties. However, should he do so he promised to pay General for the same immediately. Lacy furnished to General a financial statement to enable General to determine whether or not it desired to enter into the arrangement.

The fourth document was styled "Signatory Agreement." By it Lacy empowered General to designate someone to execute on behalf of Lacy any and all notes, trust receipts, endorsements, assignments, acceptances, conditional sales contracts, or other written instruments to carry out the financial floor plan arrangement which had been made between Lacy and General.

As stated, the foregoing four documents were all dated September 30, 1952. Only the first instrument — the "Trust Receipt Financing Statement" — was recorded. The other three were, and remained, individual private

transactions between the parties. They were not acknowledged. .

On March 30, 1953, another instrument, entitled "Trust Receipt," was entered into between Lacy and General. Under it Lacy, as "Trustee," acknowledged receipt of the automobile in question, "title to which has been retained by 'Entruster' General Contract Corporation until Trustee has paid to Entruster the unpaid balance shown on the reverse side hereof — which Trustee promises to pay to the order of Entruster ninety (90) days after date, with interest after maturity at the highest lawful contract rate." This document further provides "Trustee may exhibit said property for sale and sell same in the ordinary course of retail trade, the proceeds thereof to be held in trust for the account of Entruster." It is further provided that "Entruster" may at any time terminate this arrangement, repossess the property or the proceeds thereof, and may, at its discretion, declare Trustee's interest in the property forfeited "upon crediting Trustee's account with the amount required by law." The parties then agreed that "any underlying agreement between the Trustee and Entruster shall become part of this instrument as though set out verbatim herein." This instrument was neither recorded nor acknowledged.

It might be added here that, while the binding effect of this last instrument as between Lacy and General is not questioned, it is of some significance that Lacy did not himself sign this document. It was signed in the name of Lacy by T. Malcolm Talley, who was the branch manager of General at St. Louis, Missouri, and who had been designated by General to execute the Trust Receipt under its power of attorney by virtue of the "Signatory Appointment" instrument above set out.

It is necessary now to briefly set out the important facts bearing upon the questions under consideration which were developed by the oral testimony, about which there is no real dispute.

Williams Motor Company was the Chrysler-Plymouth dealer at Vicksburg. Lacy had a customer who desired to purchase a Chrysler. Lacy did not have a Chrysler, or, at least, not the type car the prospective purchaser desired. On July 12, 1953, Lacy called Williams and asked if he had such a Chrysler. While Williams had Chrysler cars on his floor he was not sure he had the type and color desired by Lacy's customer, so it was agreed the customer and his wife and one of Lacy's salesmen would go to Vicksburg July 13th to look at the Chrysler. This they did. The customer liked the Williams Chrysler and desired to purchase it. Lacy's salesman drove the Chrysler to Lacy's place of business in Yazoo City. Williams invoiced the Chrysler to Lacy. It was purchased by the prospect. However, Lacy did not immediately pay Williams for the Chrysler. On July 21st Commercial, who was financing Williams, in whole or part, in checking Williams, discovered the absence of the Chrysler which had been sold to Lacy, for which payment had not been made by Lacy. Williams contacted Lacy, who asked Williams if he could not use a Plymouth car. Williams said he could. The Plymouth car was on Lacy's sales floor and happened to be the automobile here in question. Lacy sent this Plymouth car to Williams, with a check to pay for the Chrysler. Williams, in return, sent to Lacy a check in payment of the Plymouth. However, Lacy did not pay General for the Plymouth he had sold to Williams.

On August 3, 1953, Commercial needed an automobile for use by one of its representatives. It asked Williams, along with some other Plymouth dealers, to make to Commercial a price on Plymouth cars. Williams did that and his offer seems to have been the lowest made to General. Williams had the Plymouth on his floor for sale. Commercial purchased the Plymouth, paying $1,684.45 therefor. General, in checking Lacy, found that the Plymouth had been sold but that General had

not been paid. Lacy told General he had mailed it a check for the Plymouth but that turned out to be untrue.

General, finding that Lacy had sold and delivered the Plymouth to Williams and Williams had sold and delivered it to Commercial, and Lacy, to that time, not having paid General for the car, on September 4, 1953, sued out this writ of replevin to recover possession of the Plymouth from Commercial, resulting, as stated, in a verdict for General.

■■ The case was submitted to the jury on the issues, first, whether Williams Motor Company was a purchaser of the Plymouth in good faith for value, and, second, whether the sale to Williams by Lacy was in the regular course of Lacy's retail business. It is noted that the stated tests were made to apply to Williams — not to Commercial. Williams was not a party to the lawsuit and the tests, had it been proper to submit them in this case, should have been directed to Commercial. The case would have to be reversed and remanded for that error except that we have concluded that the request for a peremptory instruction on behalf of Commercial should have been granted.

Now as to notice, and the effect of notice, or lack of it, on the part of Commercial that General had title to the Plymouth, Section 5080-19, 1954 Cumulative Supplement, to Vol. 4, Miss. Code 1942, defines a buyer as one who buys goods for new value and who acts in good faith, and such a person, in order not to be a buyer must possess *actual* knowledge of any limitation on the trustee's liberty of sale. It is admitted that Commercial paid new (and ample) value for the Plymouth and that it had no actual notice of the claim of General to the car. It did not know from whom the car came. Indeed, it appears this very car had been floor planned by Williams with Commercial. Under the foregoing definition, and the undisputed facts, Commercial was a buyer. Section 5080-09, said Act, provides that "No limitation placed by the entruster on the liberty of sale

granted to the trustee shall affect a buyer in the ordinary course of trade, unless the limitation is actually known to the latter.''

And Section 5080-09, said Cumulative Supplement, 2 (1) provides ''Where the trustee, under the trust receipt transaction, has liberty of sale and sells to a buyer in the ordinary course of trade * * * whether or not filing has taken place, such buyer takes free of the entruster's security interest in the goods so sold, and no filing shall constitute notice of the entruster's security to such a buyer.''

■ ■ This case illustrates the hardship which would result from a rule preventing acquisition of title to this car by the purchaser by applying the doctrine of constructive notice. Commercial bought the car from Williams. It would then have been necessary for it to have traced title back to Lacy and then ascertain the title of General by inquiry. Only the original trust receipt was placed on record. That simply announced the intention of the parties to make a financial arrangement. All the many details of such an arrangement appeared in the unrecorded papers in the private possession of Lacy and General. While in this case the inquiry would have led to Williams, then to Lacy, then to General, conceivably such an inquiry might cover a half dozen persons located in various parts of the country, depending on the number and whereabouts of the people who had transmitted title to the car. Constructive notice requirement did not apply to Commercial under the facts of this case. We do not hold that constructive notice would not be applicable and effective as to some purchasers. We deal only with the case before us.

■ ■ But General says the sale to Commercial was void and vested no title because the trust receipt of March 30, 1953, only permitted a sale by the trustee in the ''ordinary course'' of trade and that sale to Williams by Lacy was not in the ordinary course of trade. A sufficient answer to this contention might be found

in the fact, undisputed in the proof, that sales by one dealer to another is of usual and frequent occurrence between automobile dealers, of which practice those financing such dealers necessarily had knowledge. However, we think the statute settles the question. Said Section 5080-19 defines a buyer in the ordinary course of trade as one who buys for new value, acts in good faith and who has no actual knowledge of the title held by another. This does not expressly, or by necessary inference, exclude a sale of a vehicle by one dealer to another.

Section 5080-19 defines a purchaser as "any person taking by purchase. A pledgee, mortgagee, or other claimant of a security interest created by contract is, in so far as concerns his specific security, a purchaser and not a creditor."

Section 5080-09-2 (c) reads "If the entruster consents to the placing of goods subject to a trust receipt transaction in the trustee's stock in trade or in his sales or exhibition rooms, or allows such goods to be placed or kept, such consent or allowance shall have like effect as granting the trustee liberty of sale."

This was a straight-out sale by Lacy to Williams and by Williams to Commercial of one automobile. We are unable to see that such a sale to a finance company, or any other corporation, for use by one of its employees, is different, as to whether ordinary or extraordinary, from a sale to any other individual.

██ ██ General also urges that the original trust receipt between Lacy and General permitted Lacy as trustee to sell the car "in the ordinary course of retail trade," and that this sale by Lacy to Williams was not a "retail" sale. We note that the Trust Receipts Act, to which we have been making reference, nowhere uses the word "retail" sales. Throughout it uses the expression "ordinary course of trade." However, we think the word "retail" as here used is to be counter-distinguished from bulk sales, which, as to requirement of notice to creditors of the seller, are provided for under the Bulk Sales Law.

██ █ "Retail" trade, under the circumstances here used, does not have reference to the nature of the purchaser, or even the price at which the automobile sells. ██ █ Obviously, it matters not whether the sale is to an individual or a corporation, or a partnership. If a sale at less than the list price of itself takes the sale out of the category of a retail sale, then millions of purchasers would be unprotected under the Trust Receipts Act. It may be that a sale at greatly below the list price might be considered as a factor in determining whether the sale was retail but it certainly is not determinative of that question. As stated, "retail," as here used, is to be contrasted with bulk. That construction is strongly supported by the definition of one who is not a buyer in the ordinary course of trade as defined in said Section 5080-19. It is there said "Buyer in the ordinary course of trade does not include a * * * transferee in bulk."

██ █ These trust receipt laws are, and should be, construed strongly against those retaining titles under them. The entruster places the goods in the hands of the trustee for the very purpose of sale. The goods are in the possession of the trustee; are displayed and held out to the public for the specific purpose of sale. Garrett v. Hunter, 48 So. 2d 871 (Miss.). The entruster has extensive powers over the trustee and the manner of conducting his business, with the right to repossess property and build up a reserve, and do many other acts to protect himself from default in payments by the trustee. The policy of the law is set forth in this excerpt from 53 Am. Jur., page 967, Section 8: "Although valid as between the parties thereto, and, according to many authorities, if the transaction is a true tripartite trust receipt, as to creditors of the dealer trustee, the courts have not gone so far as to uphold or rather to enforce a trust receipt given by a dealer against an innocent purchaser for value from the dealer. The general rule is that if the party receiving a trust receipt in exchange

for shipping documents clothes the receiptor with the indicia of ownership of the property represented, and thereby enables innocent third parties to deal with the latter, relying on his apparent ownership, the rights of such third parties, acquired for value and without notice, will prevail over the rights of the holder of the trust receipt.''

See also 9 A. Uniform Laws Annotated, Trust Receipts Act, page 274, where it is said: ''The Act proceeds on the theory that the entruster in such case is entitled to protection only against honest insolvency of the trustee. Dishonest action of the trustee is a credit risk, and bona fide purchasers are to be protected against the entruster who has taken that risk by entrusting. (Section 9 (2) (b), * * * puts one limitation on this, if filing has occurred, as against purchasers who do not buy 'in the ordinary course of trade.' '') This controversy was caused alone by failure of Lacy, General's trustee, to pay for the car.

Reversed and judgment here for appellant.

*Hall, Kyle, Holmes* and *Gillespie, JJ.*, concur.