GENERAL MOTORS ACCEPTANCE CORP.
*vs.*
LOUIS ANACONE

Androscoggin.   February 12, 1964.

54

Sitting: Williamson, C. J., Tapley, Siddall, Marden, JJ.
Webber and Sullivan, JJ., did not sit.

*Frank W. Linnell,*
*G. Curtis Webber,* for Plaintiff.

*Milton G. Wheeler,*
*William E. McKinley,* for Defendant.

Marden, J. Complaint in trover for conversion, and here on appeal from the denial of defendant's motion for a directed verdict, from denial of defendant's motion for entry of judgment notwithstanding the verdict, from denial of motion for new trial and from final judgment entered on verdict for plaintiff.

On the motion for judgment notwithstanding the verdict based upon seven points (which points will be identified in the opinion as N.O.V. 1 through 7), defendant challenged the sufficiency of the evidence in general and specifically its sufficiency as bearing upon certain legal issues which will be later discussed.

In the motion for a new trial based also upon seven points (which will be identified in the opinion as N.T. 1 through 7), errors in the admission of evidence, in ruling one plaintiff's witness as hostile and allowing cross-examination by plaintiff's counsel, error of the trial court in declining defendant's request for certain charges of law, error in court instruction to the jury, and excessive damages were argued. Points N.T. 3 and 7 (cross-examination of plaintiff's witness as hostile and excessive damages) were abandoned on appeal and the remaining twelve points (N.O.V. and N.T.) are embodied in the nine points of appeal. Discussion of the issues now briefed will appear as the points are reached in the opinion.

The controversy stems from the contractual relationship existing among General Motors Corporation, hereinafter termed GMC; General Motors Acceptance Corporation, plaintiff, hereinafter termed GMAC; Twin Town Chevrolet, Inc., a General Motors automobile dealer, hereinafter termed Twin Town; and the factual and legal relationship between GMAC and the defendant, Louis Anacone.

The contractual relations above referred to are based upon documents having to do with the sale of automobiles by GMC through Twin Town to the open market, which documents broadly stated involve so-called "Trust Receipts," as defined and controlled by the Uniform Trust Receipts Act

(Chapter 189, R. S., 1954, as amended), hereinafter termed the Act.*

The operation which these documents reflect was as follows:

When Twin Town ordered motor vehicles from GMC, a list of such cars identified by their serial numbers and other code letters and numbers identifying model, color and accessories, were, by machine records operation, recorded upon a document which embodied not only the invoice covering the order, but a bill of sale[1] of those cars from GMC to GMAC, a trust receipt[2], a promissory note payable on demand in the amount of the invoice, with the terms and conditions of

---

* See generally Uniform Laws Annotated 9C and Supplement, Uniform Trust Receipts Act; Heindl, Trust Receipt Financing, 2 Mercer-Beasley Law Review 1 (1933); Trust Receipt Financing under the UTRA 26 Chicago-Kent Law Review 197 (1948); The Ohio UTRA 19 Ohio State Law Review 680 (1958); Trust Receipts 12 Temple Law Quarterly 189, 200 (1938); and Handbook of the National Conference * * * Uniform State Laws * * * for 1933, Uniform Trust Receipts Act.

[1] "BILL OF SALE Know all men by these presents that the undersigned for valuable consideration does hereby grant, sell, transfer and deliver unto the General Motors Acceptance Corporation (Grantee) the motor vehicles described above: to have and to hold all and singular the said goods and Chattels to said grantee, its successors and assigns. The undersigned covenants with said grantee that the undersigned is the lawful owner of said Chattels; that they are free from all encumbrances: that the undersigned has a good right to sell the same; that the undersigned will warrant and defend same against the lawful claims and demands of all persons, witness the hand and seal of the undersigned on the 'date of execution' specified above."

OLDSMOBILE DIVISION, General Motors Corporation

By _____ Accountant

[2] "TRUST RECEIPT TO GENERAL MOTORS ACCEPTANCE CORPORATION (hereinafter referred to as GMAC): The undersigned (debtor), hereinafter referred to as the dealer, hereby acknowledges that the above-described property has been shipped by the manufacturer thereof for delivery to and on the order of the dealer, subject to transfer of title thereto by the manufacturer to GMAC, under the GMAC Wholesale Plan. The dealer further acknowledges that GMAC has a security interest, in said property and agrees that the dealer's possession thereof shall be on the terms and conditions

the trust receipt[3] appearing either on the face of the document or its reverse side.

---

set forth on the reverse side and herein incorporated by reference thereto. *Executed on the 'date of execution' specified above."*
TWIN TOWN CHEVROLET COMPANY INC
(Dealer's Name)

By _____
(Attorney in Fact)

[3] "TERMS AND CONDITIONS REFERRED TO IN TRUST RECEIPT

"1.  Title to said property shall remain in GMAC as security retained for and until the dealer's payment in cash of the amount payable under and according to his (its, their) promissory note of same date and identification number.

"2.  The dealer's possession of said property shall be for the purpose of storing and exhibiting same for retail sale in the regular course of business.  The dealer shall keep said property brand new and subject to inspection and, except as may be necessary to remove or transport same from freight depot to the dealer's place of business, the dealer shall not use or operate same, for demonstration or otherwise, without express permission, and shall not in any event use said property illegally, improperly or for hire.

"3.  Said property shall be at the dealer's sole risk of any loss or damage of or to same, or to persons or other property, during removal or transportation of said property from freight depot to the dealer's place of business or at any other time during possession hereunder.

"4.  The dealer agrees to keep said property free of all taxes, liens and encumbrances, and any sum of money that may be paid by GMAC in release or discharge thereof shall be paid to GMAC on demand as an additional part of the obligation secured hereunder. The dealer shall not mortgage, pledge or loan said property, and shall not transfer or otherwise dispose of same except as next hereinafter more particularly provided.

"5.  The dealer may sell said property at retail in the ordinary course of business; provided, however, that any and all proceeds thereof shall be fully, faithfully and promptly accounted for by the dealer to the extent of the obligation hereby secured.

"6.  GMAC's security interest in said property hereunder shall attach, to the full extent provided or permitted by law, to the proceeds, in whatever form, of any retail sale thereof by the dealer until such proceeds are accounted for as aforesaid, and to the proceeds of any other disposition of said property or any part thereof by the dealer.

"7.  In the event of the dealer's default in payment under and according to said promissory note, or in the due performance of or compliance with any of the terms and conditions hereof, or in the event of a proceeding in bankruptcy, insolvency or receivership instituted

**58**

The cars were shipped by GMC to Twin Town. GMC executed the bill of sale transferring title to the cars to GMAC. By previous arrangement with Twin Town, GMAC paid GMC the invoiced charges, contemplating, again part of a prior arrangement, that Twin Town would execute the trust receipt and the promissory note payable to GMAC.

To expedite this merchandising these documents were never delivered to Twin Town for execution by Twin Town of the trust receipt and promissory note. Twin Town had previously given written powers of attorney[4] to named

by or against the dealer or the dealer's property, or in the event that GMAC deems itself insecure or said property or any part thereof in danger of misuse, loss, seizure or confiscation, GMAC may take immediate possession of said property, without demand of further notice and without legal process; for this purpose and in furtherance thereof, the dealer shall, if GMAC so requests, assemble said property and make it available to GMAC at a reasonably convenient place designated by it, and GMAC shall have the right, and the dealer does hereby authorize and empower GMAC, to enter upon the premises wherever said property may be and remove same.

"In the event of repossession of said property, then, (1) if the rights and remedies applicable to repossession hereunder are governed by the provisions concerning rights and remedies under Article 9 of, and relating to Secured Transactions under, the Uniform Commercial Code as a result of enactment thereof, GMAC shall have such rights and remedies as are thereunder provided and permitted; otherwise, (2) GMAC may, at its election, either (a) sell said property upon notice, at public or private sale, for the account of the dealer, or (b) declare this transaction and the dealer's obligation under the aforesaid promissory note to be terminated and cancelled, and retain any sums of money that may have been paid by the dealer hereunder.

"8. Any provisions hereof prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof."

[4] Omitting formal portions the powers of attorney authorized the attorney in fact:

"Upon receipt, from time to time, of Orders for motor vehicles ordered by it under the General Motors Acceptance Corporation Wholesale Plan, to effect delivery to it of motor vehicles thereunder by executing *(herewith also authorizing the signature of said attorney for such purpose to be in the form of an imprinted or otherwise reproduced facsimile signature of said attorney)*, acknowledging and delivering General Motors Acceptance Corporation trust receipts and notes covering and for the number of motor vehicles indicated by said Orders." (Emphasis added.)

employees of GMAC, in the GMAC offices through which these documents were processed, to execute the trust receipts and the promissory notes on behalf of Twin Town.

In some instances, conventional procedure was adopted by the trust receipts and promissory notes being physically executed by Twin Town.

> This merchandising practice represents the "conventional," "orthodox" or "true" tri-partite trust receipt transaction, 53 Am. Jur., Trust Receipts § 2, both at common law and under the Act. *Keating* v. *Universal Underwriters Insurance Co.*, 320 P. (2nd) 351, 354 [1-3] (Mont. 1958).

> In the terms of the trade such practice is known as "floor planning" or "flooring" motor vehicles.

Under these documents GMAC became an "Entruster" and Twin Town became a "Trustee" within the terms of the Act.

The sufficiency of the execution of these trust receipts on behalf of Twin Town by its attorneys in fact is attacked by defendant (N.O.V. 5).

Upon occasions when Twin Town, as trustee, did not have the model of, or equipment on, a car which a potential purchaser desired, Twin Town would procure the desired car from other sources and by executing an "Exchange Agreement"[5], in which GMAC released its security interest in the original car and accepted security interest in the car

---

These powers were executed by Twin Town, the signature of which was supported by acknowledgment before a Notary Public and certificate that the act of the officer of Twin Town in executing the power was in conformity with resolution of its Board of Directors endorsed on the same form were the signatures of the attorneys in fact purportedly in their own hands or by stamped facsimile.

[5] "EXCHANGE AGREEMENT (To be used only where Substituted Motor Vehicle is owned outright or is being financed by other than GMAC)

acquired by Twin Town from other sources, would purportedly substitute the "security" of the second car for that of the original car. As to the "substituted" cars involved in the present controversy, defendant urges (N.O.V. 7) that by such substitution, GMAC acquired no security interest, under the Act.

TO GENERAL MOTORS ACCEPTANCE CORPORATION (hereinafter referred to as GMAC):"

Trust Receipt Identification No. _____

New _____ (Hereinafter
        (Year)      (Make-Model)      (Identification No.)

referred to as Original Motor Vehicle)

New _____ (Hereinafter
        (Year)      (Make-Model)      (Identification No.)

referred to as Substituted Motor Vehicle)

Obtained from _____
                            (Dealer)

"In consideration of the sub-joined consent by GMAC to the undersigned's exchange of the above-described Original motor vehicle for the motor vehicle described and identified above as the Substituted motor vehicle and the release by GMAC of its rights and security interest in said Original motor vehicle under the undersigned's trust receipt bearing the identification number designated above, the undersigned acknowledges that said Substituted motor vehicle is hereby substituted in place of said Original motor vehicle under the aforesaid trust receipt, and that said Substituted motor vehicle is and shall be subject to GMAC's rights and security interest under the terms, provisions and conditions of said trust receipt, with the same force and effect as if the aforesaid trust receipt, as and when originally executed, described and covered said Substituted motor vehicle.

"The undersigned warrants that said Substituted motor vehicle is free from any encumbrance whatever other than GMAC's security interest therein and will save GMAC harmless from the lawful claims and demands of any and all persons with respect thereto."

Executed this _____ day of _____ 19___ at _____
                                                      (City)        (State)

_____
                (Dealer's signature)

By_____
        (If Corp. or Partnership)        (Title)

"GENERAL MOTORS ACCEPTANCE CORPORATION hereby consents to the exchange of the above-described Original motor vehicle for the motor vehicle described and identified above as the Substituted motor vehicle, and in furtherance thereof, releases its rights and security interest in said Original motor vehicle under the terms,

During the period that Twin Town was in operation beginning in May 1955 and ending on or about August 5, 1960 Twin Town through its Manager, Mr. Kilgore, and in 1960, through Mr. Kilgore as President, Treasurer and Manager, had done business with the defendant as a contemporary motor vehicle dealer in new and used cars. The acquaintance of the men antedated the creation of Twin Town, and both had had substantial experience in the automotive sales field.

In 1960, terminating about August 6, the periodic inspections by GMAC of Twin Town's operation to confirm presence on the floor of the vehicles which GMAC had "entrusted," found Twin Town "out of trust" viz., "short" as to numbers of cars ranging from nine in February to thirty-nine on July 25th. In each of these instances Twin Town had raised the money necessary to satisfy GMAC's security claims. Upon the next audit, August 6, 1960, Twin Town was found to be sixty-one cars short, was unable to pay GMAC off, whereupon GMAC took possession of all entrusted cars and "trade-ins" on entrusted cars then to be found. Bankruptcy proceedings on Twin Town followed.

During the latter portion of Twin Town's operations, July 25 to August 6, 1960, during which period Twin Town was admittedly in bad financial condition, Twin Town and defendant engaged in a substantial number of transactions with each other involving the alleged sales and deliveries of cars by Twin Town to Anacone for "cash" (checks), transfers by Twin Town to Anacone of multiple units on a whole-

---

provisions and conditions of the trust receipt bearing the above-designated identification number."

Executed this _____ day of_____ 19____ at _____
                                                    (City)       (State)

    GENERAL MOTORS ACCEPTANCE CORPORATION

     By_____
                                (Title)

(PREPARE IN DUPLICATE, SEND BOTH COPIES TO GMAC)

sale basis and implied delivery of cars by Twin Town to Anacone to be applied on or in satisfaction of pre-existing debts, fictitious sales in that Anacone would pay for Twin Town cars, but leave them in Twin Town's possession for sale, receiving a "bonus" for this service, and pledges of cars to Anacone.

As to fifteen motor vehicles which Twin Town allegedly transferred to Anacone between July 25 and August 6, 1960 plaintiff complains (of eighteen cars listed in the complaint, three were withdrawn by stipulation during trial) that the transfers by Twin Town to Anacone were in violation of the trust receipts and under circumstances which made Anacone a converter. Anacone admits receiving thirteen of these cars, but under circumstances which did not constitute a conversion, and denies receiving the remaining two.

### EXECUTION OF TRUST RECEIPTS BY ATTORNEYS-IN-FACT

The first attack on plaintiff's position with which we shall deal is point N.O.V. 5, in which is questioned the validity of the trust receipts which were executed on behalf of Twin Town by attorneys in fact. Separate powers of attorney over the period March 27, 1958 to July 28, 1960 had been given Geraldine E. Kavanaugh of Framingham, Massachusetts, E. C. Downie of North Tarrytown, New York, and J. A. Grenzicki of Detroit, Michigan. These attorneys in fact were employees of GMAC in the respective offices in which sales of motor vehicles from GMC to Twin Town were processed and each attorney in fact held powers from many dealers, — Grenzicki for approximately 3,000 dealers, Mrs. Kavanaugh for "some 300" dealers in parts of the Atlantic coast region, and E. C. Downie, now Mrs. Edith Byrne, from 750 to 900 dealers along the Atlantic coast. In the offices of Mr. Grenzicki and Mrs. Kavanaugh their facsimile signature was affixed from a plate and as part of a machine process; in Mrs. Byrne's office, her signature was

affixed by the use of a rubber stamp facsimile in the possession of a fellow employee. From 1,000 to 2,500 transactions each day were processed in the offices involved. In no case did the attorney in fact personally apply the plate or stamp bearing the facsimile signature. The affixation was an automatic administrative act.

As to this point, our Act requires only that the writing designating the goods concerned be signed by the trustee (Act, § 2, I. c. 1), "but these subsections do not prescribe any particular form of signature. The trust receipts * * * but constitute private agreements between the entruster and the trustee. There is nothing in these subsections or in the act as a whole to reveal an intent to change the common law of contracts as to what may be a binding form of signature on the part of a corporation." Dictum in *General Motors Acceptance Corp.* v. *Haley,* 109 N. E. (2nd) 143, 147 [4-6] (Massachusetts Act, 1952).

It has long been held under the negotiable instruments law that affixing a signature to such an instrument by a rubber stamp is sufficient to fulfill the requirement of a written endorsement, if the stamp is affixed with the intent of using it as an endorsement, and with authority. *American Union Trust Co.* v. *Never Break Range Co.,* 190 S. W. 1045, 1047 [1], 1049 [4] (Mo. 1916).

In *Eastern Acceptance Corporation* v. *Camden Trust Company,* 163 A. (2nd) 134, 138 [5] (N. J. UTRA, 1960), a case in which the signature of the trustee by an attorney in fact was questioned, together with criticism of the attorneys in fact being employees of the entruster, such signatures were held valid. The case does not reveal whether such signatures were facsimile, but such reproductions were contemplated in the present case. See that portion of the power, underlined in the footnote, wherein the signature of the attorney in fact is authorized in the form of "an imprinted or otherwise reproduced facsimile signature."

The particular phase of the execution of the trust receipts and notes by attorneys in fact for Twin Town involves what defendant contends is an unauthorized delegation of authority by the attorney in fact whereby a fellow employee actually affixed the signature of the attorney in fact, in two cases by operation of billing machinery and one by the use of a rubber stamp.

The questioned authority of this practice was submitted to the jury under instructions as to usage in the industry and the principles of delegated agency and objection to the instruction as to applicability of "usage" is point N.T. 6. For the jury to properly consider business usage significant in connection with the power of attorney granted by Twin Town it was necessary to show that Twin Town was sufficiently aware of the usage as to justify a presumption that Twin Town had knowledge of it and to have executed the power of attorney with reference to it. See 20 Am. Jur., Evidence § 333, 55 Am. Jur., Usages and Customs § 35, and *Dulac* v. *Dumbarton Woolen Mills, et al.*, 120 Me. 31, 37, 112 A. 710. We can find nothing in the record to support a conclusion that Twin Town had any knowledge of the intra office practice of GMAC in the processing of the documents involved. The tri-partite arrangement among the GMC, GMAC and Twin Town was aimed primarily at the distribution of cars in the most expeditious manner possible. The primary purpose of the powers of attorney, whereby the trust receipts and promissory notes could be executed as early as possible in each transaction, was to speed the delivery of the cars to Twin Town. The attorneys in fact had no way of knowing whether the cars listed on the invoice conformed to Twin Town's order and there was no judgment or discretion involved in the affixing of Twin Town's signature to those instruments. The printing on the documents, which are exhibits, would indicate that when they reached the attorneys in fact the full name of Twin Town,

its address and code number had already been printed on the document by the machine processes and the execution of the trust receipt and note on behalf of Twin Town was accomplished by the ministerial act of adding the name of the attorney in fact. Upon the facts in this case, the delegation of this act by the attorney in fact to a fellow employee cannot be premised upon usage.

Because these acts were only ministerial they were acts which might properly be delegated, will be regarded as the act of the agent and binding on the principal. 3 Am. Jur. (2nd) Agency § 150, and Restatement of Agency (2nd) § 78.

The execution of the trust receipts and promissory notes by delegation of the ministerial acts to fellow employees of the attorney in fact, under the circumstances of this case, was valid.

The execution of other trust receipts arose out of (a) purchase by Twin Town of cars from another dealer, which dealer transferred to GMAC and on which Twin Town itself executed a trust receipt and note, and (b) a transfer by Twin Town to GMAC of a car owned by Twin Town, possession retained by Twin Town, and a trust receipt executed (Bipartite trust receipt). These transactions as valid trust receipts, are recognized by the Act and are not challenged by the defendant.

### Substituted Security

The second attack on plaintiff's standing under the trust receipts has to do with the status of those automobiles which purportedly were substituted under the trust receipt for those originally listed, is made under point N.O.V. 7, involves three cars, and is based upon defendant's contention that the trust receipts act contemplates no such substitution.

'Apart from the trust receipts act the purported substitutions consisted briefly of a contract between Twin Town and GMAC that in consideration of GMAC's releasing its security interest in a car originally invoiced and "trust receipted," Twin Town would give GMAC security interest in another car, the substituted car, and was accomplished by a written exchange agreement[5] signed by Twin Town and GMAC which incorporated by reference the particular trust receipt affected. Such a contract is not unconventional and its effect can be challenged successfully only if it is prohibited by the Act.

ACT

Sec. 2.[6]

"I. A trust receipt transaction within the meaning of this chapter is any transaction to which an entruster and a trustee are parties, for one of the purposes set forth in subsection III, whereby

\* \* \* \* \* \* \* \* \* \*

"C. The entruster gives new value in reliance upon the transfer by the trustee to such entruster of a security interest in goods \* \* \* in possession of a trustee, and the possession of which is retained by the trustee; provided that \* \* \* the giving of new value \* \* \*

---

[5] See page 59.

[6] "Sec. 2. What constitutes trust receipt transaction and trust receipt. —

I. A trust receipt transaction within the meaning of this chapter is any transaction to which an entruster and a trustee are parties, for one of the purposes set forth in subsection III, whereby

A. The entruster or any third person delivers to the trustee goods, documents or instruments in which the entruster

1. prior to the transaction has, or for new value
2. by the transaction acquires or
3. as the result thereof is to acquire promptly, a security interest; or

B. The entruster gives new value in reliance upon the transfer by the trustee to such entruster of a security interest in instruments or documents which are actually exhibited to such entruster, or to his agent in that behalf, at a place of business of either

> "1. be against the signing and delivery by the trustee of a writing designating the goods, * * * and reciting that a security interest therein * * * has passed to * * * the entruster, * * * ."

entruster or agent, but possession of which is retained by the trustee; or

C. The entruster gives new value in reliance upon the transfer by the trustee to such entruster of a security interest in goods or documents in possession of a trustee, and the possession of which is retained by the trustee;

provided that the delivery under paragraph A or the giving of new value under paragraph B or paragraph C either

1. be against the signing and delivery by the trustee of a writing designating the goods, documents or instruments concerned, and reciting that a security interest therein remains in or will remain in, or has passed to' or will pass to, the entruster, or

2. be pursuant to a prior or concurrent written and signed agreement of the trustee to give such a writing.

The security interest of the entruster may be derived from the trustee or from any other person, and by pledge or by transfer of title or otherwise.

If the trustee's rights in the goods, documents or instruments are subject to a prior trust receipt transaction, or to a prior equitable pledge, section 9 and section 3, respectively, of this chapter, determine the priorities.

II. A writing such as is described in subparagraph I of paragraph B of subsection I, signed by the trustee, and given in or pursuant to such a transaction, is designated in this chapter as a 'trust receipt.' No further formality of execution or authentication shall be necessary to the validity of a trust receipt.

III. * * * "

*It is to be noted that subsection II refers to subparagraph I of paragraph B of subsection I. There is no subparagraph I of paragraph B of subsection I and it appears that "subparagraph I" should be "subparagraph 1." Assuming this typographical correction the Maine Act has no such subparagraph. This situation is occasioned by the fact that paragraph C was inserted in the Maine Act between paragraph B and the clause following paragraph B in the uniform trust receipts act as it appears in Uniform Laws Annotated 9C, without revising subsection II to conform to the change. Subparagraph 1 of paragraph B of subsection I of the uniform act as given in Uniform Laws Annotated 9C necessarily becomes subparagraph 1 of paragraph C of subsection I of the Maine Act.*

"New value" is defined in Section 1 of the Act[7] as including the release of a valid and existing security interest. The release by GMAC of its security interest in the original car is "new value" and is recognized consideration under the Act for the transfer by the trustee to it of security interest in the substituted goods in trustee's possession.

ACT

Sec. 2.

"II. A writing such as is described in subparagraph I * * *, signed by the trustee, and given in or pursuant to such a transaction, is designated in this chapter as a 'trust receipt.'[6] * * *."

---

[7] **Sec. 1. Definitions.**—In this chapter, unless the context or subject matter otherwise requires:

" 'Buyer in the ordinary course of trade' means a person to whom goods are sold and delivered for new value and who acts in good faith and without actual knowledge of any limitation on the trustee's liberty of sale, including one who takes by conditional sale or under a pre-existing mercantile contract with the trustee to buy the goods delivered, or like goods, for cash or on credit. 'Buyer in the ordinary course of trade' does not include a pledgee, or mortgagee, a lienor or a transferee in bulk.

" * * *

" 'New value' includes new advances or loans made, or new obligation incurred, or the release or surrender of a valid and existing security interest, or the release of a claim to proceeds under section 10; but 'new value' shall not be construed to include extensions or renewals of existing obligations of the trustee, nor obligations substituted for such existing obligations.

" * * *

" 'Transferee in bulk' means a mortgagee or a pledgee or a buyer of the trustee's business substantially as a whole.

" * * *

" 'Value' means any consideration sufficient to support a simple contract. An antecedent or preexisting claim, whether for money or not, and whether against the transferor or against another person, constitutes value where goods, documents or instruments are taken either in satisfaction thereof or as security therefor."

The section 10 referred to under "new value" above, has to do with the entruster's right to proceeds and is not here pertinent.

"In the ordinary course of trade" as used in the Act and "in the regular course of business" as used in Paragraph 2 of the terms in the trust receipt (footnote 3, page 57) are considered synonymous.

Under our Act the "exchange agreement" is a trust receipt, and GMAC acquired security interest in the substituted cars therein listed.

*In re Yost, et al.,* 107 F. Supp. 432 (D. C. Md. 1952) is cited as being critical of the "substitution" idea as applied to trust receipts and it is the only case which has come to our attention in which that phase of trust receipt transaction is discussed. In *Yost,* however, the argued substitution was not supported by any writing and the court said under [2] on Page 436:

"Where substitutions of different articles are made he should have obtained a new trust receipt designating the substituted article."

The pronoun "he" refers to the entruster. In the instant case we have both the writing and provisions in our Act, Section 2, validating the substituted security transaction.

### ESTOPPEL

N.O.V. 4 urges that GMAC's conduct, — either in continuing to finance floor-planned cars for Twin Town, after repeated defaults of the trust receipt terms, thereby permitting sales abuses of which it now complains, or remaining silent with knowledge that Twin Town was disposing of cars at wholesale prices, estops it, as a matter of law, from asserting its present claims against Anacone.

It is not clear whether Anacone bases estoppel (a) upon GMAC's broad conduct of keeping Twin Town in business or, (b) more narrowly, upon GMAC's knowledge that Twin Town was selling cars at wholesale prices in violation of paragraph 2 of the Trust Receipt.[3]

The record supports no finding that Anacone, whose burden of proof it was, proved under (a) acts of GMAC con-

---

[6] See page 66.
[3] See page 57.

stituting an estoppel, *Denison* v. *Dawes*, 121 Me. 402, 409, 117 A. 314; *Aetna Casualty & Surety Co.* v. *Eastern Trust & Banking Co.*, 156 Me. 87, 97, 161 A. (2nd) 843.

If the jury determined, as it was competent to do by inference, by virtue of transfer of some cars to Anacone at a price approximating the amount of GMAC's security interest, that such transfers were at "wholesale" prices, and that GMAC was aware of such incident, no estoppel evolves, for such purchases by Anacone did not deprive him of protection as a "buyer" and he was not prejudiced.

The remaining issues arise out of the applicability of the terms of the documents, which we have now determined to be valid trust receipts, our Act, and the conventional issues raised at trial having to do with sufficiency of evidence upon which to premise the verdict returned.

### PROMPT ACCOUNTING

Broadly speaking the "floor plan" under which Twin Town had possession of the entrusted vehicles permitted Twin Town to sell the cars at "retail in the ordinary course of business; provided, however, that any and all proceeds thereof shall be * * * promptly accounted for by the dealer to the extent of the obligation * * * secured" (¶ 5, Trust Receipt) [3].

According to the record, "prompt accounting" by Twin Town required it to remit to GMAC during business hours of the day Twin Town sold the car, sufficient money to satisfy GMAC's claim. In the event that the proceeds of a particular sale were insufficient to pay off GMAC's security interest, Twin Town was required to add funds from other sources sufficient to cancel GMAC's security interest. Other provisions of the trust receipt covering circumstances where Twin Town sold a vehicle which the purchaser had to "finance" are not here involved. In the event of Twin

---

[3] See page 57.

Town's default in payment or non-compliance with any of the terms of the trust receipt, GMAC was entitled to immediate possession (¶ 7, Trust Receipt) [3].

## RECORDATION

The "statement of trust receipt financing" executed by GMAC and Twin Town (Act, § 13), the seasonable filing of which with the Secretary of State affected the rights of purchases from Twin Town is not here involved, as filing requirements were met.

## "BUYER" UNDER THE ACT

The provisions of the Act which are centers of controversy and put in issue by N.O.V. 2 and N.T. 4, are those defining a "buyer in the ordinary course of trade" [7] and "new value" [7] as applied to such buyer. GMAC contends that, as to the cars in controversy, Anacone was not a "buyer" within the terms of the Act and, therefore, did not acquire the cars free of GMAC's security interest; — that he did not give new value; that he did not act in good faith and without actual knowledge of limitations on Twin Town's liberty of sale; that in some instances he did not take delivery of the vehicle whereby the purported sales were fictitious, — and hence not a sale under the Act (Sec. 1) and that in some instances he was a pledgee, — specifically excluding him as a "buyer" under the Act (Sec. 1) [7].

> While there is implication that Anacone was not a "buyer" because of his being a "transferee in bulk" it must be observed that the definition of "transferee in bulk" given in Section 1 [7] obviates this implication, for there is nothing in the record to justify a finding that Anacone bought Twin Town's business "substantially as a whole."

---

[3] See page 57.

[7] See page 68.

It is to be noted also that where Twin Town, under the terms of the trust receipt, had liberty of sale and sells to a "buyer in the ordinary course of trade,"[7] such buyer takes free of the entruster's security interest in the goods so sold and no limitation placed by GMAC on the liberty of sale granted Twin Town affects a "buyer in the ordinary course of trade, unless the limitation is actually known to the latter." Act, Section 9, II A.[8]

In analyzing defendant's position as a buyer who acted "in good faith and without actual knowledge of any limitation on the trustee's liberty of sale" it is urged that because of Anacone's long experience in the automobile sales field and the frequency with which he dealt with Twin Town, he must have known that Twin Town was "floor planning" its cars, and was limited to retail sales and that purchase of automobiles from Twin Town with that knowledge rendered him not a "buyer" under the Act.

Knowledge that a dealer has cars upon floor plan is not sufficient to expose a purchaser otherwise a "buyer" under the terms of the Act to the entruster's security interest. *Commercial Credit Co.* v. *Barney Motor Co.*

---

[7] See page 68.

[8] "Sec. 9. * * *

II. Where a purchaser from the trustee is not protected under subsection I hereof, the following rules shall govern:

A. Sales by trustee in the ordinary course of trade.

1. Where the trustee, under the trust receipt transaction, has liberty of sale and sells to a buyer in the ordinary course of trade, * * * such buyer takes free of the entruster's security interest in the goods so sold and no filing shall constitute notice of the entruster's security interest to such a buyer.

2. No limitation placed by the entruster on the liberty of sale granted to the trustee shall affect a buyer in the ordinary course of trade, unless the limitation is actually known to the latter."

Subsection I referred to above has to do with purchasers of negotiable documents or instruments.

*et al.*, 76 P. (2nd) 1181, 1183 [3] (Cal. UTRA, 1938);
*People's Finance & Thrift Co. of Visalia* v. *Bowman*,
137 P. (2nd) 729, 733 [14] (Cal. D. C. of Appeals,
UTRA, 1943). That knowledge which will deprive a
buyer of protection against the entruster's security in-
terest must be actual and as applied to the car in ques-
tion, *Commercial Credit Corp.* v. *General Contract
Corp.*, 79 So. (2nd) 257, 260 [1] (Miss. UTRA, 1955);
*Premium Commercial Corporation* v. *Kasprzycki*, 29
A. (2nd) 610, 613 [4] (Conn. UTRA, 1942); *General
Credit Corporation* v. *The First National Bank of
Cody*, 283 P. (2nd) 1009, 1014 [3] (Wyo. UTRA,
1955); *Refrigeration Discount Corp.* v. *Catino*, 112
N. E. (2nd) 790, 794 [7, 8] (Mass. UTRA, 1953), and
which applies equally to the "retail" limitation.

The record does not support a jury finding, if such were
made, that Anacone acquired any of the cars in controversy
with the actual knowledge required by the Act. Such a
finding, if made, would have to result from speculation aris-
ing out of the relationship of the parties.

Anacone's status as a contemporary automobile dealer did
not prevent his being a "buyer" under the Act. *Colonial
Finance Co., Inc.* v. *DeBenigno*, 7 A. (2nd) 841, 842 (Conn.
UTRA, 1939); *General Finance Corporation* v. *Krause Mo-
tor Sales*, 23 N. E. (2nd) 781, 783 [2] (Ill. UTRA, 1939).

The testing of the transactions between Twin Town and
Anacone with relation to Anacone's giving "new value,"
participating in fictitious sales and becoming a pledgee is
commented upon later.

### ADMISSION OF EVIDENCE

Points N.T. 1 and N.T. 2 charge the trial court with
error in admitting, over defense objection, Twin Town
documents (ledger cards) under N.T. 1 and (series of
checks given by Twin Town to Anacone) under N.T. 2. The

purpose of such evidence was to establish the financial relationship existing between Twin Town and Anacone during the year 1960, ending with the financial collapse of Twin Town in early September of that year. The last ledger entries are dated August 5, 1960. At face value these exhibits, with qualifying testimony, purported to show that at various times during that period Twin Town owed Anacone thousands of dollars which was paid only by Twin Town's delivering automobiles to Anacone and that such deliveries were transfers denying Anacone the status of a "buyer" and that Anacone, therefore, acquired subject to GMAC's security claim.

The trustworthiness of the ledger cards and the checks for acceptance at face value is highly questionable. The dealings between Twin Town and Anacone were handled almost exclusively by Mr. Kilgore, Twin Town's checks were issued by Mr. Kilgore, and the knowledge of Twin Town's bookkeeper, Mr. Joseph, as to the trades between Kilgore and Anacone came only from information furnished him by Mr. Kilgore and not infrequently supplied at a time subsequent to the transaction involved. Conversely, Mr. Kilgore's knowledge of the conclusions suggested by Twin Town bookkeeping was circumscribed for the same reason.

Numerous entries by Mr. Joseph on the Anacone account was occasioned by a check payable to Anacone coming across his desk without explanation and, minus explanation, Mr. Joseph entered the check as a credit to the Anacone account. A series of such entries resulted, at one stage, in the accumulation of a very substantial credit in Twin Town's favor. Messrs. Kilgore and Anacone exchanged checks, the Anacone checks being good and the Twin Town checks unsupported by sufficient funds. The extent to which these transactions were reported to Mr. Joseph is unclear. The admission of these checks and these ledger cards required the jury to conclude that Twin Town and Anacone were engaged in irregular financial dealings, out

of which plaintiff urged the jury to conclude that fifteen cars, which allegedly were transferred from Twin Town to Anacone, were so tainted by the practices referred to as to oblige the jury to find that Anacone was entitled to no protection under the Act. The admission of these exhibits cannot be said to have been improper, but whether or not the practices reflected by this evidence were identified with the cars in dispute, is another question. It was the plaintiff's burden to show that each car in controversy was traced to a transaction which would give Anacone no protection under the Act. In this it has failed. The record identifies no car for which recovery is sought as being subject of a fictitious sale or pledge.

The chart, a part of this opinion, lists the cars for which plaintiff seeks recovery, each car identified by the last four digits of its serial number. The conventional transaction between Twin Town and a purchaser was evidenced by the execution of a buyer's order, which order identified the car, expressed the terms of the sale and was signed by the purchaser. If the transaction were a "cash" sale, an invoice would be made by Twin Town identifying the car, listing equipment, accessories, and the amount received on delivery. In a sale to Anacone, Mr. Anacone prepared a sheet identifying the car, usually by a serial number and showing the price paid. On the chart we have listed with relation to each controversial car, the date of the buyer's order, the date of the invoice, the evidence of payment, the date which Mr. Anacone's records show as the date of the transaction, Mr. Anacone's position as to whether he received the car, the amount of the security interest claimed by GMAC, the sale price, where the record reveals it, and entry, if any, in Twin Town's cash journal. In each column is also indicated the plaintiff or defendant exhibit number of the document referred to, and during trial the documents which counsel had concluded were identified with the particular car in question were stapled together. In the column labeled

"comment" are remarks supported by the record, sometimes clarifying previous entries and in three instances indicating the status of the car more obscure. To illustrate this, in the first line of the chart as applied to a 1958 Chevrolet, Serial No. 0019 (Car No. 1), the record requires a finding that the buyer's order for that car was dated July 26, 1960, is defendant's exhibit 5; that the invoice date was August 5, 1960, and number 3341 and is defendant's exhibit 5; that the evidence of payment for the car was a check in the amount of $6,862, dated July 26, 1960, which check is both plaintiff's exhibit 9, and defendant's exhibit 5; the fourth document is the sheet from Mr. Anacone's record indicating that he received the car in question on July 26, 1960 and is defendant's exhibit 5; that GMAC's interest was $700; that sale price was $950 and that $6,862, was entered on Twin Town's cash journal for July 26, 1960.

The chart indicates that the 1960 Oldsmobile 0554 (Car No. 2) was part of the same transaction, but that Mr. Anacone denies receipt of the 1960 Oldsmobile. As to these two cars the record shows that they were two of four cars, that the check for $6,862 represents the total price for the four cars, but that only the 1958 Chevrolet and the 1960 Oldsmobile were under plaintiff's trust receipt. The jury was charged with determining as to fifteen such cars, whether Mr. Anacone did or did not (a) receive the fifteen cars, and (b) if he received them, did he do so under circumstances depriving him of the protection afforded a "buyer" under the Act?

The record indicates that this case was tried for five days and that the jury deliberated approximately seven hours, less the time required to leave the courthouse for an evening meal. There are 114 exhibits. The finding of a jury is not to be disturbed if there be credible evidence to support it, but we are obliged to here record that the jury findings in this case, based upon perhaps six hours of deliber-

ations must have been governed by the atmosphere of the case generated by the lengthy trial and the extremely confusing and highly irregular financial transactions alleged between Mr. Kilgore of Twin Town and the defendant, which understandably, but invalidly, resulted in the jury's conclusion that nearly all of the cars were acquired by him so tainted with those alleged practices that the identity of the practices were attached to each car. It is an example of faulty *post hoc* reasoning.

### NEW VALUE AND PROOF OF DELIVERY

The definition of "new value" in Section 1 of the Act[7] is not all inclusive. "It goes no farther than to specify that certain things shall be and other things shall not be regarded as within that term. It does not, for example, state that cash actually paid in full satisfaction of the price of an article constitutes such value" *DeBenigno, supra,* at page 844 [2] but it cannot logically be contended that cash or its equivalent is not "new value" within the requirements of the Act.

Painstaking study of the record and the exhibits leads us to conclude that the jury was justified in finding, as to delivery of the two cars which Anacone denied receiving, and the "new value" aspect of the transaction involving the thirteen cars which Anacone admitted receiving, as follows:

As to the four cars indicated by the asterisks, there is positive evidence by Mr. Kilgore which would justify a finding that those four vehicles, together with two others not under trust receipt, were transferred to Mr. Anacone in satisfaction of pre-existing debt (bad checks) in no way identified with these four cars (cf. *DeBenigno*), were not for "new value" and that Mr. Anacone was not a "buyer" under the Act. Mr. Anacone received these four cars subject to GMAC's security interest, and resolves point N.T. 5.

---

[7] See page 68.

*DeBenigno, supra,* and *Commercial Discount Co.* v. *Mehne,* 108 P. (2nd) 735 (D. C. of Appeal, Cal. UTRA, 1940) are leading cases on a definition of "new value" as applied to a credit on the books of the dealer in favor of a purchaser. Our Maine Act was adopted in 1955 and under the principles that a statute enacted after a judicial construction is presumed to take that construction, *Hutchins* v. *Libby,* 149 Me. 371, 379, 103 A. (2nd) 117, and to a lesser degree is presumed to take the construction given by a foreign court, 50 Am. Jur., Statutes § 323, and the significance of a construction applied to one of the uniform laws, create a precedent which cannot be ignored. However, we do not accept the definition of "new value" as applying to a pre-existing debt beyond the limited facts of the Connecticut case. *DeBenigno's* construction of "new value" is criticized in 53 HLR 335 (1939). *Mehne* recognizes a more valid protection to the purchaser by considering him a buyer under a pre-existing mercantile contract as allowed in the Act, § 1.[7]

Cars No. 2 and No. 13 were vehicles the receipt of which Anacone denied. The only evidence of delivery as to car No. 13 is testimonial reference to its appearing on invoice #3346, which invoice is not an exhibit. The burden of establishing delivery of this car has not been satisfied. Car No. 2 was one of four cars purportedly covered by a July 26th transaction, only two of which were under trust receipts. While car No. 1 appears on the buyer's order, the invoice, the sheet from Mr. Anacone's records and the check given to cover the four cars is in a total of the sum of the four sales prices, car No. 2 appears only on plaintiff's invoice. The 1960 Oldsmobile appearing on the buyer's order and on Mr. Anacone's record is not identified as a "Hol. Sed." but is identified as a station wagon with a different serial number. Additionally the invoice lists three cars, the

---

[7] See page 68.

third being a 1959 Ford with serial number unknown, while the buyer's order and the Anacone record lists a 1958 Mercury. These inconsistencies cast doubt upon the accuracy of the invoice which was dated ten days after the buyer's order and check, and prepared by Twin Town, inferentially from Mr. Kilgore's memory, ten days after the transaction evidenced by the buyer's order, check, and the Anacone record.

Premising proof of delivery of car No. 2 upon these facts can be only speculation. The record discloses that the jury sought instructions as to the two cars which Anacone denied receiving and were properly advised that they would have to resolve this point upon the evidence before them. The fact that the total amount of the verdict was within a few cents of the total of the security value claimed by plaintiff on the remaining thirteen cars, suggests very strongly that the jury concluded that delivery of cars No. 2 and No. 13 to Anacone had not been established, with which conclusion, if we interpret the verdict correctly, we agree. If we interpret the verdict incorrectly, we find no adequate evidence that Anacone received cars No. 2 and No. 13. See *Bridgham* v. *Hinds,* 120 Me. 444, 446, 115 A. 197. Point N.O.V. 6 is here covered.

Documentary evidence supporting the transactions on car No. 3, and car No. 12, must be read together. The four associated documents support consistently the transfer to Anacone of a 1960 Oldsmobile. The only document which carries a serial number is the invoice on car No. 3 which identified the car as a "Hol. Sed." with serial number ending in 3638. Anacone's record identified the car as a "60 Olds 4 Dr 98 White." Additionally Anacone's record carries a notation that this car was sold to Twin Town on July 29, 1960, the day following the purported sale by Twin Town to Anacone. If this be so, Anacone's responsibility for car No. 3 arising out of the July 28th deal terminated

on July 29th when it could be found that the car was returned to Twin Town. This conclusion becomes valid when the documents supporting the transaction on car No. 12 are studied. The Anacone record identified it as a "98 4 Dr HT White" with serial number 3638 but the invoice identifies it as a station wagon serial number 6253. The weight of documentary evidence on this transaction leads one to a valid conclusion that the invoice is in error and that in fact Mr. Anacone reacquired the Oldsmobile 3638 on August 3, 1960.

> The evidence justified the finding that Anacone purported to acquire this car on July 28th for $3,150, retransferred it to Twin Town the next day and acquired it on August 3, 1960 for $3,000 which was less than the security interest held by GMAC, but at a time when Twin Town was struggling for financial survival.

In the light of the conclusion reached above, invoice number 3340 does not by itself establish delivery of this car to Anacone, but documentary support of his admission that he received the car can be found in his record dealing also with car No. 1, which group of exhibits we have discussed previously in another connection, wherein it was pointed out that the only document in that group which was offered to show delivery of car No. 2 was the invoice, but on the buyer's order, and on the Anacone record supported by a check representing the total purchase price of four cars, is a 60 Oldsmobile station wagon, the serial number of which is given on the Anacone record as 6253. The only conclusion supported by the evidence is that cars No. 3 and No. 12 were so acquired.

> It is significant to note, also, that with the exception of car No. 3, which has just been discussed, and the four cars delivered to Anacone in satisfaction of outstanding bad checks, all of the cars involved were transferred to Anacone at a price never less than the

outstanding security interest. If this fact establishes by fair inference that the transfers were for wholesale prices, although no evidence so characterizes them, and while such sales, — if wholesale, were violations of the trust receipts as between Twin Town and GMAC, such sales would not prevent Anacone being a "buyer" under the Act (Sec. 1).[7]

As to car No. 14 we find nothing in the record to describe the transaction through which the car reached Mr. Anacone. According to Mr. Kilgore's testimony, this vehicle, with fourteen others, appeared on invoice number 3346 dated August 5, which invoice is not an exhibit. The total of the invoice was $23,513.48 and this amount was charged to Mr. Anacone, increasing by that amount the balance in Twin Town's favor according to the ledger entries, the infirmities of which have been discussed, ante. Because of the weakness in communication between Mr. Kilgore and Mr. Joseph, the true account between Twin Town and Anacone could not have been reflected in the ledger, in the light of Anacone's firm denial that any such debit balance ever stood against him, and Mr. Kilgore's testimony that when, on August 5th Twin Town was found to be "out of trust" on sixty-one cars and it had transferred fifteen cars to Anacone, the account between Twin Town and Anacone became substantially balanced. On that date the ledger shows over $39,000 due Twin Town from Anacone. It was a proper inference that car No. 14 reached Anacone, with others, toward satisfaction of a debt not identified with car No. 14 (see comment on DeBenigno, supra), which circumstance deprived Anacone of protection as a "buyer" and he received car No. 14 subject to GMAC's security interest.

Cars No. 7 and No. 8 appear in the series of documents reflecting a sale on August 3 with payment on August 4 by a check for $4,900, the price for the two cars is given as $5,048.11 and the difference between the invoice price and

---

[7] See page 68.

the check of $148.11 is explained by Mr. Anacone that he claimed a rebate in that amount on a car previously purchased that was "scratched up a little." We find that on the Anacone record dealing with car No. 4 on a July 29 purchase, a notation against the 1960 Oldsmobile 2472 that the price there listed was "–148.00." The explanation is logical and supported by the Anacone records which the jury could accept as trustworthy as the Twin Town record.

With the explanation just given as to the August 3rd transaction on cars No. 7 and No. 8, those cars together with cars No. 1, No. 3, No. 4, No. 5, No. 6, and No. 12 represent transactions which were not established as other than "cash" in the sense that the checks were dated on the date of the buyer's order, were in amounts identical to the sale prices shown on the documents, the checks were honored upon deposit, were shown on the Anacone record as being received on the day indicated by the check and the buyer's order, and were sales for new value. As to these cars the evidence fails to show that Mr. Anacone was anyone but a "buyer" under the Act, and entitled to take these vehicles free of GMAC's security interest. A finding that Mr. Anacone was answerable to GMAC on these vehicles is not justified by the record.

We have determined that cars No. 9, No. 10, No. 11, No. 14, and No. 15 reached Mr. Anacone subject to GMAC's claim. These conclusions cover points N.O.V. 1 and 2 as applied to the Act.

### CONVERSION

To this point we have discussed the legal status of the parties under the trust receipts and the Act, and we arrive at the final point N.O.V. 3, which challenges the jury's conclusion that Anacone converted property of GMAC.

The gist of conversion is the invasion of a party's possession or right to possession at the time of the alleged conversion.

The plaintiff must show that he had a general, or a special property in the goods, and the right to their possession at the time of the alleged conversion. *Carey* v. *Cyr and Denico,* 150 Me. 405, 406, 113 A. (2nd) 614; *Sanborn* v. *Matthews,* 141 Me. 213, 217, 41 A. (2nd) 704.

If the holder acquired possession rightfully, a demand by the person entitled to possession and a refusal by the holder to surrender is necessary before the withholding becomes a conversion, but if the taking by the holder was wrongful, that taking is a conversion without demand. Where the circumstances show that a demand would be useless, a demand is not necessary. 53 Am. Jur., Trover and Conversion § 88, *Sanborn, supra,* at 217; *Dean* v. *Cushman,* 95 Me. 454, 456, 50 A. 85; *Hagar* v. *Randall,* 62 Me. 439, 441.

Unquestionably GMAC had a general, or special property in the cars under the trust receipts, Act, Sec. 1 definition of "Security Interest." If plaintiff's property consists of title, it is a general property. If plaintiff's property is a "security interest" it is a special property. See *Kasprzycki, supra.* We are not here concerned with a distinction. GMAC did not have possession, it had been delivered to Twin Town for purposes of sale. Only upon the default in certain conditions set forth in the trust receipts did GMAC thereafter become entitled to possession,[3] Act, Sec. 6 I.[9] One such condition was that Twin Town upon sale should "faithfully and promptly" pay off GMAC's claim, to wit remit during business hours of the day of sale the proceeds to GMAC. Only upon default by Twin Town of this

[3] See page 57.

[9] "Sec. 6. * * *

I. The entruster shall be entitled as against the trustee to possession of the goods, documents or instruments on default, and as may be otherwise specified in the trust receipt.

II. An entruster entitled to possession under the terms of the trust receipt or of subsection I may take such possession without legal process, whenever that is possible without breach of the peace."
* * * * * * *

term, material here, did GMAC's right to possession arise. Until such default occurred, the sale by Twin Town was valid, delivery of possession of the car to the purchaser was authorized and possession by the purchaser was rightful, whether or not he were a "buyer."

Upon default by Twin Town, and the accrual of GMAC's right to possession, the rightful possession of a purchaser not a "buyer" could be transferred into a conversion only after demand by GMAC and refusal by the holder-purchaser to surrender. No demand was made by GMAC on Anacone nor was evidence given to establish a demand useless.

The rights of plaintiff in trover stand, therefore, upon a tortious taking by Anacone.

As a "buyer," Anacone acquired Twin Town cars free of GMAC's security interest, whether or not Twin Town seasonably paid off GMAC, Act, Sec. 9.[8] Were a purchaser, not a "buyer," to acquire cars from Twin Town and Twin Town paid off GMAC, there would be no security interest to be imposed upon the vehicle involved. As to cars which Anacone acquired not as a "buyer" (in satisfaction of antecedent debt) and on which Twin Town violated its trust receipt by non-payment, these were held by Anacone subject to GMAC's claim, but absent demand for possession by GMAC, and refusal by Anacone, Anacone's liability to GMAC was under an implied contract, as a debtor.

The legal status of these parties is peculiar to their factual relationship. Cases dealing with trover and conversion under the conventional mortgagor-mortgagee, conditional vendor-vendee, pledge and bailment relationships do not control. The significant distinction is the "liberty of sale" granted the trustee.

---

[8] See page 72.

In answer to point N.O.V. 3 upon the theory of conversion, upon which the complaint was founded, the defendant is entitled to judgment *non obstante veredicto*.

In trial, however, GMAC claimed damages which would normally be identified with a complaint under an implied contract to wit, an implied promise to pay the security interest of GMAC.

The rule of damages applicable to a complaint in trover for conversion is the value of the goods at the time of conversion *Brown* v. *Haynes,* 52 Me. 578, 583; *Sanborn, supra,* and *Bartlett* v. *Newton,* 148 Me. 279, 287, 92 A. (2nd) 611, even though the plaintiff may be accountable therefor to some third party, *Bradley Land and Lumber Company* v. *Eastern Manufacturing Company,* 104 Me. 203, 206, 71 A. 710. All evidence on damages in the present case was confined to the plaintiff's security interest, which would be plaintiff's measure of damage in trover only were it accountable to the defendant for any remaining interest in the property, *Bradley Land and Lumber Company, supra,* which here it was not.

Inasmuch as the case was tried partly in trover and partly in implied contract, without objection, we conclude that a new trial is more properly ordered. Rule 50 (b) M. R. C. P.

It is fair to assume that a retrial would be lengthy, expensive and pose no simpler jury question upon the complicated and confusing transactions between these parties than herein existed.

As indicated, the jury would have been justified in finding under the terms of the trust receipts and the Act that Mr. Anacone took five cars subject to the security interest of GMAC totaling $11,904.69. If the plaintiff cares to accept judgment against Mr. Anacone in that amount with

interest from date of the complaint, it may do so, provided, however, that execution issuing upon such judgment will not be in a capias form.

> *Appeal sustained, judgment reopened and new trial ordered, unless plaintiff shall within 30 days from filing of mandate remit such amount of the verdict as exceeds $11,904.69, and accept straight execution therefor.*

| Vehicle | Buyer's order date | Invoice date | Evidence of payment | Anacone record | Anacone testimony or stipulation | GMAC's Security Interest | Sale Price | Cash Journal | Comment |
|---|---|---|---|---|---|---|---|---|---|
| 1. 58 Chev. 0019 | 7/26/60 D Ex #5 | 8/5/60 #3341 D Ex #5 | Check 7/26/60 $6862.00 P Ex #9—D Ex #5 | 7/26/60 D Ex #5 | Receipt admitted | $700.00 | $950.00 | $6862 entered 7/26/60 | Covers four cars, these two under Trust Receipt. Check represents payment for four cars. Car #0019 on all exhibits but car #0554 only on invoice. |
| 2. 60 Olds. 0554 | "  " | "  " | "  " | "  " | *Receipt denied* | $3271.98 | $3262.00 | | |
| 3. 60 Olds. 3638 | 7/28/60 D Ex #7 | 8/5/60 #3351 D Ex #7 | Check 7/28/60 $3150.00 P Ex #6—D Ex #7 | 7/28/60 D Ex #7 | Receipt admitted | $3313.20 | $3150.00 and on 8/3/60 $3000.00 | $3150 entered 7/28/60 | Anacone exhibit states sold to Twin Town on 7/29. Invoice not consistent on Olds. Ser. No. See *** below and opinion. |
| 4. 60 Olds. 2472 | 7/29/60 D Ex #1 | 7/29/60 #3290 D Ex #1 | Check 7/29/60 $5486.00 P & D Ex #1 | 7/29/60 D Ex #1 | "  " | $3215.46 originally but $842.86 at trial | $3223.00 | $5486 entered 7/29/60 | Transaction involved two cars, totaling check listed. Only #2472 under Trust Receipt. Carries notation of $148.00 refund due **. |
| 5. 60 Chev. 0718 | 8/1/60 D Ex #2 | 8/1/60 #3312 D Ex #2 | Check 8/1/60 $5042.00 P & D Ex #2 | 8/1/60 D Ex #2 | "  " | $2482.99 | $2483.00 | $9042 entered from Anacone 8/1/60 | Check represents payment for both cars. |
| 6. 60 Chev. 0137 | "  " | "  " | "  " | "  " | "  " | $2492.58 | $2559.00 | | |
| 7. 60 Chev. 3283 | 8/3/60 D Ex #4 | 8/3/60 #3322 D Ex #4 | Check 8/4/60 $4900.00 P & D Ex #4 | 8/4/60 D Ex #4 | "  " | $2272.22 | $2272.22 | | Car prices total $5048.11 less $148.00 rebate to adjust on previous transaction. ** |
| 8. 60 Olds. 7663 | "  " | "  " | "  " | "  " | "  " | $2765.89 | $2765.89 | | |
| 9. 60 Chev.* 1893 | Undated D Ex #6 | 8/5/60 #3338 P Ex #5 | Invoice marked "Paid—KHK" | | "  " | $2521.51 | $2490.96 | | Total invoice $7660.68. Kenneth H. Kilgore was the Manager and later President, Manager and Treasurer of Twin Town. |
| 10. 60 Chev.* 0373 | "  " | "  " | "  " | | "  " | $2348.17 | $2448.26 | | |
| 11. 60 Chev.* 4244 | "  " | "  " | "  " | | "  " | $2637.17 | $2721.46 | | |
| 12. 60 Olds. 6253 | 8/3/60 D Ex #3 | 8/5/60 #3340 D Ex #3 | Check 8/4/60 $4200.00 P Ex #3 | 8/3/60 D Ex #3 | "  " | $3211.65 | $3262.00 | | Transaction involved two cars totaling check listed. Only #6253 under Trust Receipt. Anacone record not consistent. See *** above, and opinion. |
| 13. 60 Chev. 1365 | | | | | *Receipt denied* | $2420.38 | | | Invoice given as #3346 in testimony. No exhibit. |
| 14. 60 Chev. 4416 | | | | | Receipt admitted | $1910.82 | | | |
| 15. 60 Chev.* 0640 | | | | | "  " | $2487.02 | | | Invoice given as #3339 in testimony. No exhibit. |

* These four cars (plus two others not here involved) delivered to Anacone to cover bad checks outstanding.