WALTER E. FRYE *vs.* E. I. DUPONT DENEMOURS & COMPANY.

Cumberland.     Opinion September 30, 1930

290

*Joseph E. F. Connolly*, for plaintiff.
*Bradley, Linnell & Jones*, for defendant.

Sitting: Pattangall, C. J., Dunn, Sturgis, Barnes, JJ.
Philbrook, A. R. J.

Sturgis, J.    Action of assumpsit to recover for three car loads of boards, claimed to have been shipped direct to designated consignees, upon the orders of defendant's local Superintendent. The verdict was for the plaintiff and the case comes forward on Motion and Exceptions.

MOTION

The evidence shows that the E. I. duPont deNemours & Company of Wilmington, Delaware, in 1926, operated a box shook mill at Deering Junction and maintained a branch office at 73 Bell Street in Portland, Maine. Its local Manager was E. L. Melia and the Superintendent of its mill was Henry E. Sargent.

As a manufacturer of boxes, the Company was a buyer of standing timber and sawed boards in this section of the State. Under the rules of the Company, all lumber contracts were made by the local Manager, but, in practice, the contracts were made by the Superintendent, except for formal confirmation and execution by the Manager. The Superintendent was "second in command," occupying an office with the Manager and, in the latter's absence, had full charge of the Company's business.

The testimony of the plaintiff is that, some time in the latter part of October, 1926, a timber buyer, Currier L. Norris, called on him at his mill and lumber yard in Poland, Maine, looked over his sawed lumber, and began negotiations for the purchase of the boards on the sticks. The plaintiff's statement of his conversation with Mr. Norris at this time, brought out on cross examination by defendant's counsel, is:

"A.    Mr. Norris came up and asked me what I had for lumber to offer. I said, 'I have quite a bunch of it all around here.' He said, 'I am buying for the duPont people and I can

move by their approval what you have got here, if it suits them.' And I gave him a price of $35.00 F. O. B. cars. He says, 'I will go back and report to them and they will send their man up to look at it.' Then he said, 'They will probably buy the whole of it and move it right off.' "

According to the plaintiff, Mr. Norris came again to Poland and said, "They have been up and seen it and they are going to buy it," but gave no orders for shipment. A few days later, having heard nothing further, Mr. Frye called the Company's office at Portland on the telephone and talked with Mr. Sargent, the Superintendent of the mill, who, upon being asked about loading the lumber, said, "Place a car and we will be up — send a man up and grade it." Relying upon this order, a car was placed and, in a few days, Henry A. Cassidy, a lumber surveyor in the employ of the defendant Company, accompanied by Mr. Norris, came to Poland and graded the lumber as the plaintiff loaded it. On December 3, 1926, the car was shipped out under a bill of lading made by Mr. Cassidy, the plaintiff not being informed to whom it was consigned or in whose name it was shipped.

Hearing nothing from this shipment, in about three weeks, the plaintiff went to the Portland office of the defendant Company and his account of what happened there is as follows:

"Q. What happened?

A. I called for the boss.

Q. Tell us what was said and done?

A. They said he was busy and I waited a few minutes and then he was ready for me. I gave them my name.

Q. What boss do you refer to? ·

A. Mr. Melia.

Q. What did you say to him?

A. 'My name is Frye from Poland.' When he learned who I was, he says, 'Mr. Sargent is the one who has charge of that end of it.'

Q. What happened?

A. He called one of the clerks from the other room outside and he called Mr. Sargent.

Q. Going on with that, did you and he have any talk?

A. Yes, sir. He says, 'Come out. I am busy outside'; and we went out of a door, out to what he called his office, outside in the yard. I says, 'When will I expect some money for that?' He says, 'Wait a little while.' He says, 'I hope you aint afraid of this Company.' I says, 'No. Their reputation is good enough for me.' 'But,' I says, 'They have more money than I have.'

Q. What else?

A. That is about all. I said, 'When do you expect another car, or aint you going to load any?' He said, 'We are taking a car as soon as we can.'"

The plaintiff testifies that he wrote a letter, addressing it to the E. I. duPont deNemours & Company at its Portland office asking whether or not they were going to take the boards, or the "rest" of the boards. He is apparently somewhat confused as to whether he sent the letter before the first car was ordered or after that shipment and before the second car was ordered. Upon a careful reading of his testimony, we think his testimony as to the letter must be taken as a statement that it was mailed after the first shipment and before the second car was ordered. He received no reply to the letter, but a few days later was called on the phone, recognized the voice of the speaker as that of Mr. Sargent, the Superintendent, and gives as the substance of that conversation that "He wanted me to get a car placed." The second car was placed and Mr. Cassidy, the Company's grader, came up again with Mr. Norris, graded the lumber, and, on January 4, 1927, billed and shipped the car to the McDonald Mfg. Co. at Portland.

The plaintiff states that he received still another telephone message from the Superintendent asking him to place a third car, which also was loaded and graded by Mr. Cassidy, and on February 9, 1927, shipped to the Noyes Lumber Company at West Gonic, New Hampshire.

The plaintiff further testifies that, after the shipment of the third car, he again went to the office of the Company at Portland and there talked with both Mr. Sargent, the Superintendent, and

Mr. Melia, the General Manager. He says that he asked Mr. Melia for his money and was told "that the money didn't come along" and "I guess you will get your money when the time comes right." The plaintiff's reply was, "It's about time." He then said to Mr. Sargent, "When shall I expect my money? It is about time, two cars are overdue, and I can use some money." Mr. Sargent's reply was, "You will get it soon."

Dissatisfied with the results of his conference with Mr. Melia and Mr. Sargent, the plaintiff consulted his attorney and, at a conference in the latter's office, which was attended by Mr. Melia, was informed by him, or by the Company's attorney who was present, that the three car loads of boards in controversy were not purchased on the account of the defendant Corporation but by Mr. Sargent on his personal account as a private business transaction. The plaintiff asserts that this was his first knowledge of such a claim, that he intended to sell only to the Company, justifiably believed that he had, and is entitled to recovery against it.

Harry N. Cassidy, the Company's surveyor, who graded and billed the lumber, was called as a witness. His testimony is that he was ordered to go to Poland and grade the lumber by Mr. Sargent, the Company's Superintendent, and, while, from the nature of the order given to him, he suspected that the transaction was outside of the Company's business, he went there on the Company's time, made no disclosure of his suspicions to the plaintiff or any other officer of the company, and made no report of his absence or the grading upon his return. He states that he wasn't informed by Mr. Sargent that the transaction was his own personal matter, and had actual knowledge of that claim only after all shipments had been made.

The Company, in its defense, called to the stand Henry E. Sargent, formerly its Superintendent, but now discharged. He testifies that he bought the boards in controversy from Mr. Norris for his own account and not for the Company and admits that he sold them to the firms to which they were consigned, and he has received his pay. He denies that he purchased the boards from the plaintiff, either personally or for the Company.

Mr. Sargent admits, however, that he talked with the plaintiff

over the telephone, fixing the time of the conversation as after the first car was loaded. His testimony is:

"Q. Mr. Frye called up the office and asked for you and you answered the telephone?

A. I am sure that was the way of it because they called me to the telephone.

Q. He wanted to know about placing the car?

A. As I understand it, after the car was placed, Mr. Frye wanted to know about loading it.

Q. Do you recall what Mr. Frye said to you at the time?

A. That was all. That was all he wanted to know.

Q. He told you on the telephone — he told you that the car had been placed?

A. Yes. And wanted to know about loading it, because, I suppose, he was there ready to load.

Q. That was the first car?

A. Yes, sir.

Q. Did you, at that time, tell him anything about the duPont Co.?

A. No."

Mr. Sargent also insists that after the first car was shipped, he told the plaintiff that the defendant Company had nothing to do with the purchase of the boards. He says that, when the plaintiff came to the Company's office, after the first car was shipped and wanted his money, he saw that the plaintiff thought that the duPont Co. in some way was connected with the transaction, and so informed him that the Company had nothing to do with the lumber. His testimony on this point, in cross examination, is:

"Q. What did Mr. Frye say to you on the first trip that involved the duPont Co. in this matter?

A. He came to the duPont office for the money and wanted to get it from the duPont Co.

Q. You told him that the duPont Co. had nothing to do with it?

A. That was my statement.

Q. What did he say to that?

A. He said that he sold to the duPont Co. through Norris.

Q. Did he say that?

A. Yes, sir.

Q. And he persisted in that?

A. Yes.

Q. In spite of everything you said?

A. Yes, sir. So we had quite a little argument.

Q. You say you told him that the duPont Co. had nothing to do with it and that you bought it?

A. I am quite sure of that. I am telling it just as I remember it.

Q. That was between the first and second cars?

A. I am quite sure it was."

Mr. Norris, the lumber buyer, supports the defendant's contention. He denies that he was ever in the employ of the defendant Company or that he ever told the plaintiff he was buying for it. He claims that the plaintiff sold the boards to him and he, in turn, sold them to Mr. Sargent. He says that his only reference to the duPont Co. was a statement to the plaintiff that the boards were being sold to Mr. Sargent, who worked for that concern. Mr. Norris has filed a voluntary petition in bankruptcy and, while in his schedules he has listed the plaintiff as a creditor, no claim has been proved.

Upon this evidence, neither materially strengthened nor weakened by other evidence in the record, the jury found for the plaintiff. It is clearly evident that his testimony was accepted as substantially true. Upon the record, we are not impressed to the contrary. The questions on the Motion therefor are can the plaintiff recover upon the evidence taken most favorably in his behalf. Was there a sale to the Company? Is the Company estopped to deny its Superintendent's agency and authority in this transaction?

It is well settled that the liability of a principal is not limited to such acts of the agent as are expressly authorized or necessarily implied from express authority. All such acts of an agent as are within the apparent scope of the authority conferred upon him are binding upon the principal, apparent authority being that which, though not actually granted, the principal knowingly permits the

agent to exercise or holds him out as possessing. And whether or not a principal is bound by the acts of his agent when dealing with a third person, who does not know the extent of the agent's authority, depends not so much upon the actual authority given or intended to be given by the principal as upon the question, what did such third person, dealing with the agent, believe and have a right to believe as to the agent's authority from the acts of the principal. When a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence, conversant with business uses and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of his principal the particular act in question, and such particular act has been performed, the principal is estopped to deny the agent's authority to perform it. *Feingold* v. *Supovitz,* 117 Me., 371; *Davies* v. *Steamboat Co.*, 94 Me., 379, 385; *Heath* v. *Stoddard,* 91 Me., 499; 21 R. C. L., 856, 907; 2 C. J., 461. This doctrine is established to prevent fraud and proceeds upon the ground that, when one of two innocent persons must suffer from the act of a third, he is to sustain the loss who has enabled the third person to do the injury. *Packard* v. *Insurance Co.*, 77 Me., 144; *Thorne* v. *Casualty Co.*, 106 Me., 274, 281.

In the case at bar, the defendant Company placed its Superintendent, in its local office at Portland, Maine, second in command only to its local General Manager. It entrusted the purchase of standing timber and sawed lumber to these agents and they exercised this authority as occasion required. Accepting the plaintiff's testimony as true, after information from Norris, the timber buyer, that the Company would buy his boards, the plaintiff took the matter up in an ordinary and businesslike way. He called the Company's office on the telephone and received an order from the Superintendent of the mill to place a car. By direction of this same Superintendent and, as appears in the record, with the consent of the local General Manager, the Company's surveyor came to Poland and graded the car, and it is a fair inference that, the sale being F. O. B., the lumber was in fact delivered to the surveyor and by him shipped.

That is not all, if the plaintiff can be believed. Not hearing from his shipment, he went to the Company's office and called for the boss, and the General Manager, on learning his errand, turned him over to the Superintendent, who asked him to wait for his pay and told him that another car would be loaded as soon as possible. It is unnecessary to restate the plaintiff's account of subsequent conversations with the Company's employees which resulted in the shipment of two more cars of boards, a demand for his pay, and a conference with his attorney.

We are of opinion that, if the jury found the facts as the plaintiff claims them to be, they were warranted in the conclusion that, either the boards were in fact purchased on the Company's account but fraudulently resold on its Superintendent's personal account, or that, while the transaction was a personal purchase of the Superintendent, the Company had placed him in such a situation that the plaintiff, in good faith, believed and had a right to believe that he was making the purchase on the Company's account and had authority to do so. Upon either conclusion, a verdict that the defendant must bear the loss occasioned by the fraud of its employee is not clearly wrong.

It is not made to appear that the verdict for the plaintiff for $2,308.17 exceeds the unpaid value of the boards shipped, with interest from date of demands. The verdict is sustained.

EXCEPTIONS

On cross examination, defendant's counsel asked the plaintiff if he knew that Mr. Norris, the timber buyer, was not working for the duPont Co. The reply was, "No sir; he said he was." The defendant's motion, to strike out from the answer what Mr. Norris said, was denied. No prejudice resulted. The plaintiff makes no claim that Mr. Norris was an agent of the defendant Company and there is no evidence of his agency. It can not be assumed that the jury rested its verdict upon such a finding. Furthermore, in subsequent cross examination, counsel for the defendant brought out, and left in the record without objection, a statement of Mr. Norris of like effect. Where evidence is admitted over objection and an exception is taken, the party excepting will waive the benefit of

his exception if he afterward introduces the same evidence or that of like effect. *Weide* v. *Davidson*, 15 Minn., 258; *Southern R. Co.* v. *Blanford*, 105 Va., 373; 3 C. J., 958.

The defendant's second Exception can not be sustained. The declaration of the Assignee of Norris, the timber buyer, in a suit against Sargent has no probative value in establishing the market value of the board shipped by the plaintiff.

The defendant takes nothing by his Exception to the refusal of the presiding Justice to direct a verdict for the defendant. Our conclusions upon the Motion sustain this ruling below.

Exceptions four to seven, as stated by counsel on the brief, relate to the same subject matter. Ignoring the plaintiff's claim of a contract growing out of delivery of the boards upon the order of the Company's Superintendent, the counsel for the defendant insists that the plaintiff can prevail only upon proof of a contract with Norris, the timber buyer, and requested the presiding Justice below to instruct the jury that, unless they found Norris was the agent of the defendant Company, their verdict should be for the defendant. Upon the same reasoning, the defendant requested instructions that the statement of the Company's Superintendent and General Manager were immaterial. The instructions were properly refused. As presented, they excluded from consideration issues clearly within the pleading and proof.

Finally the defendant requested an instruction that, as a matter of law, upon pleadings and proof, the plaintiff could not recover for the first car of lumber shipped. Neither fact nor law warrants this instruction. It was not within the province of the Court to take this issue from the jury.

<div style="text-align:center">

*Motion overruled.*
*Exceptions overruled.*