### OCEAN NATIONAL BANK OF KENNEBUNK

v.

### Joseph Gordon DIMENT and Mary Diment.

Supreme Judicial Court of Maine.

Argued March 10, 1983.

Decided July 1, 1983.

Crowley & Crowley, Robert E. Crowley (orally), Biddeford, for plaintiff.

Ayer, Hodsdon & Austin, Stephen Y. Hodsdon (orally), Ralph W. Austin, Kennebunk, for defendant.

Before McKUSICK, C.J., and GODFREY, NICHOLS, CARTER, VIOLETTE and WATHEN, JJ.

VIOLETTE, Justice.

This appeal arises out of a contest over the ownership of 200 shares of Sears, Roebuck & Co. (Sears) common stock. At the close of the evidence in a jury trial in Superior Court, York County, directed verdicts were entered for defendants Joseph Gordon Diment and Mary Diment on both the plaintiff's complaint and the defendants' counterclaim. We deny the appeal.

I.

In 1971, to assist their son in obtaining a bank loan from the Colonial Trust Company (Colonial), the Diments signed a Hypothecation Agreement authorizing the son to pledge 200 shares of their Sears stock as collateral. The agreement stated, in part, that the Sears stock would be subject

to disposition in accordance with the terms and conditions of the instruments evidencing [the] indebtedness, obligations and liabilities, and/or the direction of the debtor . . . .

As part of the loan transaction, the son then signed a Consumer Collateral Note (Colonial Note) which included the following language:

Until full payment of all maker's liabilities . . . the Bank is authorized to exercise all rights of the maker with respect to the collateral without obligation to do so.

Finally, to complete the transaction, the Diments delivered two stock certificates, each made out to the Diments as joint tenants and representing 100 shares of Sears stock, to Colonial. Both the Diments and their son gave undisputed testimony that the Diments gave up their stock only for the limited purpose of pledging it as collateral for the son's Colonial Note.

In 1972, the son and his wife arranged a new loan, to be secured by the Sears stock, with Ocean National. At that time, Ocean National Senior Loan Officer Douglas Spencer wrote his counterpart at Colonial that

Mr. Diment [the son] has come to us for a loan to pay off the indebtedness which he has with your bank which is secured by his Sears, Roebuck stock. Would you please quote me a close-out as of Friday, December 22, 1972. Also, would it be possible for you [to] forward the certificates to me at the time of your close-out quote.

Colonial mailed the stock certificates to Ocean National and, when the Ocean National loan closing occurred on December 22, the son and his wife signed stock assignment forms in their names assigning the Sears stock as collateral to Ocean National. At no time during this transfer were the Diments notified that their stock was no longer being held by Colonial.

The son testified that he informed Spencer, before the stock certificates were mailed from Colonial, that the stock belonged to his parents. Spencer, however, testified that he always believed the stock was owned by the son. He explained that he relied on the son's representation of ownership and approved the loan prior to actual receipt of the stock certificates. When the letter containing the stock certificates arrived from Colonial, Spencer merely confirmed that the certificates registered to "Diment" had arrived before filing them in the vault.

The son and his wife defaulted on their loan payments in 1975. When Ocean National attempted to sell the stock, it discovered that the names on the stock assignment forms did not match those on the stock certificates. Ocean National then requested the Diments to sign a stock assignment form and they refused. The Diments testified that Ocean National's request was

their first indication that their stock certificates were not still being held by Colonial.

Ocean National brought this suit seeking both a declaration that it held a perfected security interest in the Sears stock and damages resulting from the Diments' failure to supply the requested stock assignment form. The Diments counterclaimed, charging Ocean National with conversion. Acting on the parties' motions for directed verdicts at the close of the evidence in their jury trial, the presiding justice then dismissed Ocean National's complaint and ordered an entry of judgment for the Diments on their counterclaim. The presiding justice ruled that Ocean National had converted the Diments' stock and that the conversion occurred on December 22, 1972, the date the bank took the stock as collateral for the son's loan.

## II.

■ Ocean National contends that, as a matter of law, the Hypothecation Agreement signed by the Diments in connection with the Colonial loan expressly authorized their son to transfer the Sears stock. Ocean National then claims that the language in the son's Colonial Note that "the Bank is authorized to exercise all rights of the maker with respect to the collateral" extended those powers of transfer to Colonial.

The Hypothecation Agreement, however, only served to shield Colonial from liability for acting at the son's direction. Because it nowhere confers any powers upon the son, it could not confer any powers upon Colonial via the Colonial Note.

## III.

Ocean National next contends that, even if the Hypothecation Agreement did not expressly authorize the son's actions, a jury issue exists on whether the Diments were bound by their son's actions under some form of agency theory, either apparent authority, agency by ratification, or agency by estoppel.

■ The standard of review for determining whether a directed verdict was properly ordered is that '

> we must view the evidence, 'including every justifiable inference,' in the light most favorable to the plaintiff so that we may decide whether by any reasonable view of this evidence a jury verdict for the plaintiff could be sustained.

*Gulesian v. Northeast Bank of Lincoln,* 447 A.2d 814, 816 (Me.1982) (quoting *Boetsch v. Rockland Jaycees,* 288 A.2d 102, 104 (Me. 1972)).

■ Each of Ocean National's agency theories requires that the bank believed, at some point, that the son was acting as the Diment's agent. *See, e.g., Perkins v. Philbrick,* 443 A.2d 73, 75 (Me.1982) (ratification); *Wilkins v. Waldo Lumber Company,* 130 Me. 5, 11–14, 153 A. 191, 193–94 (1931) (ratification and estoppel); *Frye v. E.I. DuPont deNemours & Co.,* 129 Me. 289, 297, 151 A. 537, 540–41 (1930) (apparent authority); *Restatement (Second) of Agency* §§ 27, 82, 103 (1958) (all three). In this case, however, there was no evidence introduced of any conduct by the Diments which might have led Ocean National to believe that their son was their agent. The Ocean National bank officer who dealt with the son testified, in fact, that he neither considered the son to be the Diments' agent nor dealt with the son as such.

We find that, under "any reasonable view of the evidence", Ocean National failed to establish that it in any way believed that the Diments' son was his parents' agent. We therefore find no error in the presiding justice's order of a directed verdict on the bank's agency theories.

## V.

■ Ocean National also argues that it was entitled to a jury determination on the issue of unjust enrichment. "To bring a case within the scope of the equitable doctrine of unjust enrichment, there must be some specific legal principle or situation which equity has established or recognized. The retention of the property must be in

violation of a duty that the law imposes." *City of Auburn v. Mandarelli,* 320 A.2d 22, 31 (Me.1974). Because Ocean National wholly failed to prove that the Diments owed it any duty, no claim for unjust enrichment could arise.

## VI.

Finally, Ocean National appeals from the entry of a directed verdict against it on the Diments' counterclaim for conversion. The bank contends that no conversion occurred and that, if it did occur, the presiding justice erred in his assessment of damages.

■ "The gist of conversion is the invasion of a party's possession or right to possession at the time of the alleged conversion." *General Motors Acceptance Corporation v. Anacone,* 160 Me. 53, 82, 197 A.2d 506, 524 (1964); W. Prosser, *Handbook of the Law of Torts* § 15 at 93 (4th ed. 1971). The converter need not intend any conscious wrongdoing, as conversion entails "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights . . . . A mistake of law or fact is no defense." Prosser, *supra,* at 83.

To determine whether Ocean National converted the Diments' stock, we must examine whether the Diments authorized Ocean National's possession of the stock and whether Ocean National's conduct towards the stock constituted a sufficient exercise of control over it. *See id.* at 85; *Restatement (Second) of Torts* §§ 224–29 (1965).

■ Ocean National contends that, under both the Hypothecation Agreement and two provisions of the Uniform Commercial Code, it was authorized to possess the Diments' stock. In both these arguments, however, Ocean National commits the same error of construing provisions holding Colonial harmless for reliance on the son's direction as affirmative grants of authority to Colonial. As previously noted, for example, the Hypothecation Agreement merely authorized Colonial to rely on the son's directions regarding the disposition of the stock. The Agreement in no way gave either the son or Colonial the authority to transfer the stock to a third party as collateral for a new loan.

Ocean National then points to two sections of the Uniform Commercial Code which act to protect the holder of certain collateral from liability for specified transfers. 11 M.R.S.A. §§ 8–318, 9–207(2)(e) (1978 & supp. 1982). The bank first asserts that these sections shielded Colonial from liability for its transfer to Ocean National. Then, because 11 M.R.S.A. § 8–301(1) states that a transferee such as Ocean National acquires all the rights in securities which a transferor such as Colonial had, Ocean National argues that it acquired the right to hold the stock as collateral.

■ None of the cited statutory provisions, however, confer the necessary authority on Ocean National. Section 8–318, like the Hypothecation Agreement, conferred no powers upon Colonial but merely held Colonial safe if it followed the son's directions. Next, section 9–207(2)(e), which deals with a "repledge of collateral" by a secured party, is clearly inapplicable to Colonial's outright relinquishment of the stock certificates to Ocean National. Finally, section 8–301(1) itself confers no authority but merely transfers to Ocean National that authority which Colonial held. Here, Colonial had no authority to transfer the Diments' stock to Ocean National; no corresponding authority to possess the stock could thus be conferred on Ocean National pursuant to section 8–301(1).

■ The final argument raised by Ocean National is that, even if it did not have the authority to possess the Diments' stock, no conversion took place until the Diments made a demand for it. *See General Motors Acceptance Corporation,* 160 Me. at 83, 197 A.2d at 524. Ocean National's use of the Diments' stock as collateral for their son's loan, however, constituted a "sufficiently serious interference" with the Diments' right to possession as to subject the bank to liability for conversion without

the necessity of a demand by the Diments. *Restatement (Second) of Torts* § 229 & Comment b (1965); *see O'Connell v. Chicago Park District,* 376 Ill. 550, 556, 34 N.E.2d 836, 840 (1941); *Varney v. Curtis,* 213 Mass. 309, 312–18, 100 N.E. 650, 652–54 (1913).

The presiding justice properly ruled that Ocean National converted the Diments' Sears stock and that the conversion occurred when Ocean National took possession of the stock as collateral for the Diments' son's loan on December 22, 1972. The justice therefore properly assessed damages based on the stock's value on that date.

The entry is:

Judgment affirmed.

All concurring.