STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, SS.                                    Docket No. CV-10-116

                                                  2AMM  -4 21 2012

MG Industries,                    )
                 Plaintiff,       )
                                  )
                                  )
                                  )
         v.                       )               **JUDGMENT**
                                  )
                                  )
William F. LeRose                 )
  d/b/a Precision Tool Grinding Co.  )
                 Defendant.        )


This matter came before the Court on February 8, 2012 for a jury-waived trial.[1]
Plaintiff appeared and was represented by Attorney Baber. Defendant appeared and
was represented by Attorney Bos.

Plaintiff manufactures weapons using various components, and Plaintiff
contracted with the Defendant to machine certain of these components. The parties
worked well together for a period of time, so well that Defendant installed a new
machine, a "mini-mill", in his shop for the purpose of making the components for the
Plaintiff. When the relationship between the parties broke down, a question about
ownership of the machine and disagreement over the quality of the components arose.
The parties also dispute the amount of money owed by each to the other.

Plaintiff asserts a claim for conversion asserting that Defendant converted
Plaintiff's mini-mill, inventory, drawings and programming. Defendant asserts in his
counterclaim that Plaintiff failed to pay Defendant for machining and goods produced.
Plaintiff also asserts that Defendant owes it money/credit for defective goods, guns and
components, and miscellaneous items.

I.      Conversion – Mini-Mill

        When the relationship of the parties was mutually satisfactory, Plaintiff
        desired that the Defendant be able to machine components more quickly. To
        that end, the parties found a "mini-mill" that they thought could accomplish
        that goal.

---

[1] The undersigned asked to listen to tapes of the hearing, and there was a fair amount of
confusion and difficulty finding all of the required tapes. For future reference, the following
tapes contain the recording: Bangor 6060 (beginning at index 2584), 6061 (index 103 to 204,
error), 6062 (error), 6063 (index 18 to end), **and** 6064 (beginning at index 102).

1

The Defendant purchased the Mini-Mill, and financed it through his bank. The Bank took a security interest in the mini-mill. Shortly thereafter, and before the loan was paid, Defendant signed a bill of sale selling the machine to the Plaintiff. Defendant also represented to the Town that the machine was the property of the Plaintiff. Plaintiff and Defendant agreed that Plaintiff would make the monthly payments to the bank for the Mini-Mill. The payments were $555.72 per month. Plaintiff made twelve monthly payments, but not always in a timely fashion. The late payments and late fees also became a dispute between the parties

Defendant ultimately returned the Mini-Mill to the entity that sold the Mini-Mill to him and he paid off his bank loan. Defendant did not inform Plaintiff that he intended to return the machine.

Given the bill of sale and the representation to the Town, the Court finds that the machine was transferred to the Plaintiff. At the time the machine was transferred to the Plaintiff and through the time the machine was converted, the Bank held a security interest in the property.

The Court finds that Defendant converted the mini-mill, and that the Plaintiff's damages in this regard are **$6,668.64**.


II.     Conversion – inventory/forgings, drawings and programming

The Plaintiff also claims that Defendant converted materials, including forgings; drawings; and programming.

A. Inventory/forgings
Plaintiff provided certain raw materials to the Defendant, Defendant machined the materials, and then billed the Plaintiff. At the time the relationship between the parties was severed, certain of these materials, in various phases of completion, remained at the Defendant's shop. Defendant provided a list of inventory that remained at his shop after the relationship was severed. See *Plaintiff's Exhibit #45*.

Plaintiff provided the following raw materials: forgings for the lower receivers, barrel blanks and gas tubes. It appears that the Defendant provided the raw materials for the mag wells[2].

The items on the inventory were in various stages of completion when the relationship was severed. Plaintiff was not charged and did not pay

---

[2] If Plaintiff provided the raw materials for the mag wells, it did not meet its burden of proof in this regard.

for any of the machine time that had been put into any of the items listed on the inventory.

Plaintiff demanded return of its property, and Defendant did not return the property. Therefore, the Court finds that Defendant converted the items on the inventory that Plaintiff proved originated from raw materials supplied by the Plaintiff.

The measure of damages in a conversion action is the value of the property at the time of conversion. See *Doughty v. Sullivan*, 1995 Me. Lexis 147. Plaintiff demands money damages for such property, and Defendant suggests that he simply return the property. The Court finds the appropriate remedy on this conversion claim is money damages. *Id.* The question is the amount to be awarded.

Plaintiff testified that the retail price for the items listed on the inventory is approximately $102,000.00. Plaintiff arrived at this figure by multiplying the various items on the inventory with the price he would charge his customers for the fully finished items.

The Court does not find that the price the Plaintiff would have charged for the fully finished items to be the appropriate measure of damages. The items were in varying stages of completion, may not have been coated, and were not ready for sale. Even though the most specific testimony regarding the value of the inventory was $102,000.00, the Court does not accept this value. The value on the conversion claim is the value at the time of the conversion.

However, the Court accepts the testimony that the cost to the Plaintiff for each forging (in an unfinished state) which would become a lower receiver was $15.00 to $25.00. There were 477 lower receivers in the Defendant's shop when the relationship soured, and the value at the time of conversion would not have been less than the cost of the forgings. The Court awards Plaintiff **$9,540.00** (477 x $20/each) for these items. It appears the mag wells were made from raw materials supplied by the Defendant. The Court heard no testimony about the cost of the other items on the inventory or about their value in whatever state they were in at the time of the conversion. Plaintiff bears the burden to prove its damages. With respect to the items on the inventory, other than the forgings, the Court finds that Plaintiff did not meet its burden.

In addition to the inventory provided by the Defendant, Plaintiff asserts that additional forgings were at the Defendant's place of business in June, 2010 when the relationship was severed. The Defendant's inventory lists 477 lower receivers, and Plaintiff estimated that 700 to 800 lower receivers were at the Defendant's shop in June of

3

2010. The Court is satisfied that all of the forgings and components that were at the Defendant's shop in June of 2010, other than lower receivers that may have been returned by Plaintiff for credit, are reflected on *Plaintiff's Exhibit #45*.

B. Drawings and Programming

Plaintiff paid $45,000 for drawings by University of Maine engineering students, and he gave such drawings to Defendant. Plaintiff was initially billed $150,000 for such drawings, and the difference between the billed price and the amount paid was not explained.

In *Mitchell v. Allstate Ins. Co.,* 2011 ME 133, the Court explained as follows:

"To establish a claim for conversion, the plaintiff must show an invasion of the plaintiff's possession or right to possession by demonstrating "(1) a property interest in the goods; (2) the right to their possession at the time of the alleged conversion; and (3) when the holder has acquired possession rightfully, a demand by the person entitled to possession and a refusal by the holder to surrender." *Bradford v. Dumond,* 675 A.2d 957, 962 (Me. 1996) (quotation marks omitted). "The converter need not intend any conscious wrongdoing," but need only act with "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Ocean Nat'l Bank of Kennebunk v. Diment,* 462 A. 2d 35, 29 (Me. 1983) (quotation marks omitted). "A mistake of law or fact is no defense." *Id.* (quotation marks omitted)."

Plaintiff gave the Defendant the drawings for the Defendant's use in manufacturing gun parts for the Plaintiff. The Court is satisfied that the drawings were incomplete in some respects and required supplementation by the Defendant. Defendant used the drawings in his shop for the purpose of manufacturing parts for the Plaintiff. By its very nature, the shop environment is very dirty, and both parties acknowledged the same.

The claim for damages for the drawings is a difficult issue in this case. Plaintiff claims that Defendant converted the drawings because the drawings were not returned upon request. Defendant claims that he threw the drawings away after they became shop-worn.

Plaintiff met its burden to establish that the Defendant converted the drawings.

The only evidence of value of the drawings is that Plaintiff paid (or arranged to pay) $45,000.00 for the drawings, and that his one set of

4

drawings was provided to the Defendant. The Court awards Plaintiff **$45,000.00** for conversion of the drawings.

Defendant also charged Plaintiff for programming to manufacture parts requested by the Plaintiff. The programming was part of the labor cost of producing the parts that were produced. The Court does not find the act of programming itself or the related charges to be the subject of conversion. The programming was necessary to produce the parts that were in fact produced. Moreover, the Court awarded Plaintiff $45,000.00 for the drawings, and an award for the programming would be akin to an award of double damages.

III. Punitive Damages

A punitive damage award must be based on tortious conduct and may be awarded only if the tortfeasor acted with malice. *Laux v. Harrington*, 2012 ME 8. To support an award of punitive damages, Plaintiff must establish by clear and convincing evidence that the defendant's conduct was motivated by actual ill will or was so outrageous that malice is implied. *Id*

The Court does not find that an award of punitive damages is appropriate in this case. Plaintiff was late in its payments to the Defendant and late in its payments to the bank. All of this led was part of what led to a souring of the relationship between the parties. Plaintiff did not exercise good judgment in leaving its only set of drawings for key components at a machine shop, and Defendant believed he had copies of the drawings. Defendant's conduct in discarding the drawings and returning the mini-mill were due to a desire not to be left with monthly payments on a machine he didn't need, and not to keep dirty, shop-worn drawings.

Plaintiff did not establish by clear and convincing evidence that the Defendant's conduct was motivated by actual ill will or was so outrageous that malice is implied.

IV. Accounts
A.
The parties agree and the Court finds that Defendant provided services/products to the Plaintiff in the total amount of $139,905.42. The parties agree and the Court finds that Plaintiff paid Defendant $110,260.76. Therefore, the Court awards Defendant/Counterclaim Plaintiff **$29,644.66**.

B.
Plaintiff alleges that he is due a credit of $6,406.00 for guns he sold to the Defendant, and for which Defendant has not paid. See *Plaintiff's Exhibits B-G*.

5

The Court finds that Plaintiff gave Defendant the component in *Plaintiff's Exhibit 13B*. It was a mis-marked part, Plaintiff was not billed for the part, and the Court accepts Defendant's testimony that Plaintiff gave this part to him.

Defendant testified that he paid Plaintiff for the first couple of guns he received from the Plaintiff, and then credited Plaintiff's account for the later guns. The Court is sufficiently satisfied that Defendant paid for the gun listed in *Plaintiff's Exhibit* 13C so as to not award damages to the Plaintiff on this item. The Defendant's testimony that he paid the Plaintiff by check for the first few guns was clear, and the Court accepts Defendant's testimony with respect to paying for the gun listed on *Plaintiff's Exhibit 13C* by check.

This leaves *Plaintiff's Exhibits 13 D, E, F and G*. The Court does not find any credit on *Plaintiff's Exhibit 17* for any of the invoices in *Plaintiff's Exhibits 13 D, E, F and G*[3]. While it appears that the Defendant is someone who pays his bills on time, and expects the same of others, Defendant's testimony with respect to giving credit for the guns he sold was equivocal: "thinks" and I "don't know"[4]. Given the burden of proof, the Court awards Plaintiff **$4,357.00** on this aspect of his claim.

C.
Plaintiff alleges that he is due a credit of $ 35,858.46 for defective parts and miscellaneous entries. *See Plaintiff's Exhibits 13H-13Q*. Plaintiff testified that he brought quality control issues to Defendant's attention on several occasions. While the Court accepts that Plaintiff brought quality control issues to Defendant's attention on occasion, the Court is not satisfied that Plaintiff articulated any serious quality issues until January of 2010. The first invoice from the Plaintiff to the Defendant for defective parts is dated in January of 2010.

The Court disregards *Plaintiff's Exhibit 13H* as Plaintiff testified that the lower receivers manufactured by the Defendant had serial numbers in the 20,000 series. The lower receivers listed on *Plaintiff's Exhibit 13H* are all in the 10,000 series.

The Court accepts that the items listed on *Plaintiff's Exhibit 13I* were defective and that Plaintiff produced at least a part of *Plaintiff's Exhibit 13I* in January of 2010. The description of the defects as recited on the exhibit is precise and the serial numbers, to the extent the parts have serial numbers, are in the

---

[3] The Court closely examined *Plaintiff's Exhibit 13G* and the entry for 11/3/09 on *Plaintiff's Exhibit 17*, and is not satisfied that *Plaintiff's Exhibit #17* contains any credits for guns sold.

[4] Defendant also testified that he custom made a suppressor for a .45 caliber for the Plaintiff and that Plaintiff gave him a rifle in exchange for the work. The Court has no evidence that such rifle is one of the guns listed in any of the *Plaintiff's Exhibits*.

20,000 series. *Plaintiff's Exhibit 13I* also contains an entry for the hours "Cory" spent in working in Defendant's shop when "Cory" was on Plaintiff's payroll. While Defendant may not have wanted Cory in his shop and may have been pressured by the Plaintiff to make the arrangement, the Court is satisfied that Defendant did accept Cory's labor and agreed to pay Plaintiff for the same. The Court awards Plaintiff **$11,392.72** for the defective parts and Cory's labor, all as reflected on *Plaintiff's Exhibit 13I*.

*Plaintiff's Exhibit 13L* references a Hybrid .223. Plaintiff did not allege that this gun was defective, but alleged that this gun was sold by the Defendant and Plaintiff's account was not credited. There is no evidence this gun was credited to Plaintiff's account. The Court awards Plaintiff **$1,080.00** for this item.

Defendant testified, and the Court accepts, that the industry custom in the machining field is that if a product is defective the customer must return the product, and then the customer is given credit. The parties in this case observed this custom. The Court is satisfied that Plaintiff returned the items listed in *Plaintiff's Exhibits 13 J, K, M-P*. The Court is not satisfied that Plaintiff returned the 99 M3 grease gun mag wells listed on *Plaintiff's Exhibit #13Q* to the Defendant, and further is not satisfied that the items were defectively manufactured[5]. The Court awards Plaintiff **$9,714.60** for the returned items listed on *Plaintiff's Exhibits 13J, K, M, N, O, P, and Q*[6].

D.
Plaintiff alleges that it is due a credit in the amount of $71, 492.73 for merchandise that was returned to it by its customers. *See Plaintiff's Exhibit #18*. Mr. Gwinn testified that he directed his secretary to compile Exhibit 18 by listing each return that was attributable to a part supplied by the Defendant. The Exhibit lists the entire product sold by the Plaintiff that incorporated an allegedly defective part manufactured by the Defendant. The Court does not find this document deserves much weight due to the number of questionable entries. First, there are at least three items for an "unknown charge back". Second, there are entries for the following, none of which seem attributable to a defective part from the Defendant: "wrong produ", "paid for

---

[5] Defendant testified that sometime before the Mill was purchased he produced M3 grease gun mag wells in accord with the University of Maine specifications and that the items fell apart. Plaintiff testified that when the Defendant produced a small number of the M3 grease gun mag wells, they were fine, but on larger runs the mag wells were not satisfactory. The Defendant billed for 56 M3 grease gun mag wells very early in the business relationship, and billed for the 99 M3 grease gun mag wells in early April 2009. Sufficient questions surround whether the 99 M3 grease gun mag wells were faulty due to the UM design or because of the manufacturing process to cause the Court not to award Plaintiff damages for these items. Moreover, invoicing for these items over 2 years after they were provided to the Plaintiff raises question. And, as noted above, the Court is not satisfied that these items were returned to the Defendant.
[6] The Court did not award Plaintiff the cost of the programming listed on *Plaintiff's Exhibit 13Q* or the charge for anodizing.

twice", "over payment", "error, cancel", "cancelled inv", "cancelled by". Additionally, a number of the memo/reason for return lines are blank. Finally, the entry on 4/15/09 relates to a QCB product, a product not manufactured by the Defendant. Mr. Gwinn was unable to explain certain questionable items listed on the Exhibit. The person who prepared the document did not testify. While the direction given by Mr. Gwinn was to compile a list of returns attributable to the Defendant, given the number of questionable entries on the document, the extent to which such direction was followed is open to significant doubt. The Court does not find *Exhibit #18* sufficiently reliable, and does not enter any award to the Plaintiff based upon returned items.

Judgment for the Plaintiff in the amount of $87,752.96.
Judgment for Defendant/Counterclaim Plaintiff in the amount of $29,644.66.

The Clerk shall enter this Judgment upon the docket by reference.

Dated: April 21, 2012

Ann M. Murray, Justice
Maine Superior Court

8

**STATE OF MAINE**
**PENOBSCOT, SS.**

**SUPERIOR COURT**
**CIVIL ACTION**
**Docket No.: CV-2010-116**
? ₄∧\\₄ - ₹₁N - 6/20/2012

MG INDUSTRIES,                    )
                                  )
            Plaintiff             )    **ORDER ON**
v.                                )    **MOTION TO AMEND**
                                  )    **JUDGMENT**
WILLIAM F. LEROSE, d/b/a          )
PRECISION TOOL GRINDING CO.,      )
                                  )
            Defendant             )

After notice and opportunity for objection, the court grants Plaintiff's motion to amend judgment. Accordingly, judgment dated April 21, 2012, is amended to reflect that judgment is entered in favor of Plaintiff, MG Industries in the net amount of $58,088.30, plus interest and costs.

It is so ordered.

Date:    6|20|12

_____
Justice, Superior Court